**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Harris A. SHAPIRO et al., Defendants.**

**No. 72 Civ. 269.**

United States District Court,
S. D. New York.

Sept. 28, 1972.

Kevin Thomas Duffy, Regional Administrator, Securities and Exchange Comm., New York City, for plaintiff; William D. Moran, Paul Chernis, and Stephen D. Oestreich, New York City, of counsel.

Monasch & Chazen, New York City, for defendant Harris A. Shapiro; Hartley J. Chazen and David M. Waldman, New York City, of counsel.

Shea, Gould, Climenko & Kramer, New York City, for defendant Norman Berman; Milton S. Gould, Ronald H. Alenstein and Robert Gold, New York City, of counsel.

## OPINION

MacMAHON, District Judge.

This is an action, brought by the Securities and Exchange Commission ("S. E.C.") under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 of the S.E.C., for an injunction permanently enjoining defendants from violations of the Act and for an order directing defendants to disgorge any profits realized by them from alleged non-public insider transactions in stock of Harvey's Stores, Inc. ("Harvey's") after they had learned of an undisclosed proposed merger between Harvey's, a manufacturer and retail seller of wearing apparel whose stock is traded on the American Stock Exchange ("AMEX"), and Ridge Manor Development Corporation ("Ridge Manor"), a privately-held Florida land company.

Immediately upon filing the complaint, the S.E.C. moved for a preliminary injunction. An evidentiary hearing on the motion was subsequently consolidated, pursuant to Rule 65(a)(2), Fed.R.Civ.P., with an accelerated trial on the merits and the case was tried to the court without a jury.

Defendants Unschuld, Kaplan, Frederick Robinson, Elliot Robinson, Zises, Rosenbloom and Rothberg have consented to the entry of a permanent injunction against them and orders directing disgorgement of the proceeds of their transactions in Harvey's stock during the period in question, and the court has appointed a trustee to take charge of those proceeds. The two remaining defendants, Shapiro and Berman, are contesting the action.

Defendants Shapiro and Berman are partners in a financial consulting business specializing in acquisitions and mergers. Merger negotiations between Harvey's and Ridge Manor began in October 1970, when Shapiro and Berman, acting as finders on behalf of Ridge Manor, approached David Rosenbloom, a Harvey's director and personal friend, with a merger proposal. Rosenbloom brought the matter to the attention of Harvey's board of directors, which, after some consideration, turned it down. The board's decision was communicated directly to Joel Friedland, Ridge Manor's president and major shareholder, by letter dated December 11, 1970, from William Richter, chairman of the board of Harvey's and, with Gerald Cohen, a member of the company's two-man merger and acquisition team.

Apparently undaunted by Richter's letter, Friedland again raised the subject of merger with Shapiro while the latter was vacationing in Florida in late December. As a result of their discussions, Friedland supplied Shapiro with his company's latest financial data, including uncertified year-end figures prepared by the company's accountants. Thereafter, Shapiro returned to New York and, in collaboration with Berman and an accountant, prepared a pro forma consolidated financial statement projecting the expected income of Harvey's and Ridge Manor as a merged entity.

Shapiro and Berman then arranged a January 6 luncheon meeting among themselves, Friedland and Rosenbloom to reactivate Harvey's interest in the merger, at which Shapiro showed Rosenbloom the pro forma statement. Rosenbloom reacted favorably and remarked that he thought the merger made sense and would discuss the matter with the other members of Harvey's board. After the luncheon, Shapiro and Berman made their first purchase of Harvey's stock.

Shapiro purchased 500 shares at prices between $7 and $7⅛ per share, and Berman purchased 100 shares at $7¼.

Berman next arranged a meeting on January 21 among himself, Shapiro, Richter and Cohen, at which Richter and Cohen presented the merger terms which would be acceptable to Harvey's and agreed, at Shapiro's and Berman's request, to state the terms in writing. Meanwhile, Shapiro, apparently on his own initiative, spoke with N. Robert Kaplan, a long-time friend and former brokerage customer, about Harvey's stock and suggested to Kaplan that he look into it.

Several days later, on January 25, Harvey's executive committee, consisting of Richter, Cohen, Rosenbloom and Andrew Heine, met and decided to send that afternoon the requested letter setting forth Harvey's terms for the proposed merger. The letter was then delivered by hand to Shapiro at the Regency Hotel in New York. It provided, in substance, that Harvey's would agree to merge with Ridge Manor on condition that all Harvey's outstanding restricted shares be registered with the S.E.C. prior to the closing, that someone purchase at least 200,000 of the restricted shares at $14.50 per share, and that employment contracts be granted to seven Harvey's executives.

Upon receipt of the letter, Shapiro telephoned Berman in Philadelphia, who, earlier that day, had made his second purchase of Harvey's stock, buying 400 shares at between $7⅛ and $7⅜ per share. The next day, January 26, moments after AMEX opened, Shapiro made his second purchase of Harvey's stock, buying 500 shares at between $7⅛ and $8 per share. On the same day, Benjamin Pakula, a businessman and substantial investor in securities, unaware of the proposed merger, sold 500 shares of Harvey's common stock.

Meanwhile, on the morning of January 26, Shapiro, Berman, Richter and Cohen had met to review Harvey's letter proposal. Richter reiterated the condition that 200,000 of Harvey's restricted shares be purchased at $14.50 per share before the merger could be consummated. This provision was designed to enable holders of the restricted shares, Richter and Cohen among them, to sell, if they wished, their investment in Harvey's at the time of the merger without taking a loss. During the meeting, Shapiro telephoned Jay Zises, a business acquaintance, to ask if Zises could arrange financing for the restricted shares. The meeting ended without any further progress and, an hour later, Shapiro delivered to Zises financial information on the merger, including the pro forma statement and Ridge Manor's year-end figures.

The same afternoon, Shapiro and Berman visited Danard Unschuld, a New York stock broker and sometime business partner of Shapiro's, at Unschuld's office at C. B. Richard, Ellis & Co. Shapiro introduced Berman to Unschuld and suggested that Berman open an account with Unschuld, which he did. Berman testified that "it is possible" that at the time he may have told Unschuld about the Harvey's-Ridge Manor merger negotiations. In any event, Berman purchased, through Unschuld, 400 shares of Harvey's stock at $8⅜ per share, his third purchase of Harvey's stock since negotiations began. The next day, January 27, Unschuld, himself, purchased 100 shares of Harvey's at $9⅜ per share for his own account.

The next development in the negotiations was a January 28 meeting between Richter, Cohen, Heine and Rosenbloom of Harvey's, and Zises and Shapiro. The meeting was arranged by Berman, at the request of Zises, and Zises presented a proposal to meet Harvey's terms by financing the purchase of Harvey's restricted stock. The meeting ended abruptly and, according to defendants, hostilely, when Zises asked for a ninety-day exclusive agency to arrange the financing.

Throughout this period, parallel merger discussions were in progress between Harvey's and Liberty Circle Corporation, a privately-held dress manufactur-

er. On January 28 or 29, Representatives of Liberty Circle orally stated to Harvey's board their acceptance "of the concept of being acquired by Harvey's." Were these two companies to merge, it was estimated that Harvey's per share earnings for the year ending January 31, 1971 would increase from 29¢ to between $1.25 and $1.50. Defendants, although unaware of Liberty Circle by name, knew as early as mid-January 1971, that Harvey's was negotiating for the acquisition of some company other than Ridge Manor.

On the afternoon of January 28, Shapiro and Berman made their third and fourth purchases, respectively, of Harvey's stock. Shapiro purchased 500 shares at $9½ to $9¾ per share, and Berman purchased 200 shares at $9½. Unschuld also bought 200 shares at $9⅜.

On January 28 and 29, Douglas Lipp, an accountant and office administrator and investor in securities, unaware of the proposed merger between Harvey's and Ridge Manor or of the negotiations with Liberty Circle, sold 400 shares of Harvey's stock.

Meanwhile, in Philadelphia, on January 28, Shapiro and Berman met with representatives of the Robinson family, including Shapiro's friend, Frederick I. Robinson, holders of a large block of restricted Harvey's stock, to persuade them to sell their holdings, as part of the merger, to Ridge Manor. The meeting represented further efforts by the finders, Shapiro and Berman, to meet Harvey's demand that 200,000 of restricted shares be bought out at $14.50 at the time of merger. The Robinsons were noncommital but insisted on equal treatment with Harvey's controlling shareholders. At the meeting, Shapiro and Berman informed Frederick Robinson that Harvey's was negotiating with Ridge Manor and supplied him with the financial details of the deal, including the pro forma earnings statement for the merged company and the Ridge Manor year-end figures.

On February 2, 1971, as the result of an inquiry by a Dow Jones reporter, an announcement on the Dow Jones tape quoted Bernard Hirsh, then president of Harvey's, as saying that he could not explain the sharp increase in the price of Harvey's stock. Hirsh, in charge of Harvey's retail sales operations, was apparently unaware of the merger negotiations. At the time of the announcement, 1:30 P.M., the stock was up $1¾ reaching a high of $12⅜ on a volume of 6,000 shares traded and up 3 points over the prior two trading days.

Later in the afternoon, Kaplan and Unschuld purchased additional shares of Harvey's stock. Kaplan bought 500 shares at between $12⅜ and $12½. Unschuld bought, on a solicited basis, 100 shares each for three customers and 200 shares for a "discretionary" account at $12½ per share.

The same day, Martin J. Schwimmer, a professor of accounting and corporate finance who was informed of Hirsh's statement over the Dow Jones tape and was unaware of the merger negotiations with Ridge Manor, instructed his broker to sell out his position of 600 shares of Harvey's at the rate of 200 shares per day.

On February 3, principals of Harvey's and Liberty Circle met to discuss merger. The meeting was adjourned in the late afternoon. During the day, Kaplan purchaser 1,500 shares of Harvey's at between $12⅜ and $12¾ per share; Unschuld purchased 300 shares for a "discretionary" account at between $12⅜ and $13⅜ and also purchased 100 additional shares on a solicited basis at $13¾ per share; and Frederick Robinson purchased 1,000 shares at between $12⅞ and $13¼ per share.

On the morning of February 4, the Harvey's-Liberty Circle meeting of the previous day reconvened, but recessed by mid-day having failed to reach an accord. In the afternoon, a meeting was held at the offices of Harvey's attorneys between the principal of Ridge Manor and Harvey's executive committee and its counsel. The terms of the merger

were discussed, but no final agreement was reached. Representatives of Harvey's did, however, introduce a new condition to the merger terms, namely, that Ridge Manor agree to pay Harvey's $500,000 liquidated damages in the event the merger fell through.

Before the meeting ended, the parties discussed the need for a public announcement about the negotiations in order to correct Hirsh's earlier statement professing no knowledge of any reason for the unusual rise in the price of Harvey's stock. It was decided by those present, Shapiro and Berman included, that an announcement would be issued the following day stating that Harvey's was negotiating with two companies. Before the meeting adjourned, an updated pro forma statement of Harvey's and Ridge Manor as a merged company, based on year-end figures, was distributed to all persons present.

On the next day, February 5, Harvey's issued a press release, which appeared on the Dow Jones tape at 11:57 A.M., and reported Harvey's to be in active negotiations on two potential, but unidentified, acquisitions, although "definitive" terms had not yet been reached. Following the announcement, the price of Harvey's stock rose 2½ points to a high of $18¼ per share at the close of the day's trading.

The same day, the compliance director of D. H. Blair Securities Corporation, where Richter is a vice president, issued, at Richter's suggestion, an interoffice memorandum stating that "no orders may be executed in . . . [Harvey's stock] for any firm account" or "any accounts of partners or employees of the firm . . . or customers [of the firm]" because personnel of D. H. Blair "are in possession of material information involving . . . [Harvey's] which has not been publicly disclosed."

On the same day, February 5, Friedland also met in Boston with Maurice Wilkens, a vice-president of the Paul Revere Life Insurance Corporation ("Paul Revere"), an institutional buyer of stock, and tried to interest that company in purchasing 100,000 shares of Harvey's stock at $14.50 per share after the merger was consummated. Friedland explained the details of the merger to Wilkens and supplied Wilkens with Ridge Manor's year-end statement and the pro forma statement of Harvey's and Ridge Manor as a merged company. At the close of the meeting, Wilkens stated that he was ready to recommend the purchase by his company of 100,000 shares of Harvey's. Friedland then reported to Shapiro that Paul Revere was interested in the merger and that Wilkens "gave oral approval for the purchase" if the merger were consummated.

In the afternoon of February 5, Shapiro made his fourth transaction in Harvey's stock, buying 10 calls at $17½ per share.

Merger negotiations between Richter and Friedland continued over the telephone on the weekend of February 6 and 7. On Monday, Harvey's executive committee met to discuss the proposed Ridge Manor deal. On the same day, Frederick Robinson purchased 1,000 shares of Harvey's at between $18⅞ and $19 per share.

Later in the week, Wilkens telephoned Friedland and was informed that the merger was in progress and would be finalized within two or three weeks. Wilkens told Friedland that Paul Revere was prepared to purchase 100,000 shares at $14.50 per share contingent upon the continued stock exchange listing for Harvey's after the merger and upon a review of the proxy statement to be issued by Harvey's.

On February 9, Harvey's executive committee, with Shapiro present, met with the principals of Ridge Manor to discuss the merger. A so-called "letter of intent" was drafted and distributed, unsigned, to the parties. It contained the mechanics of the merger, as well as a number of prerequisites to the deal, including shareholder approval and continued listing of Harvey's on the AMEX, purchase of 100,000 restricted shares, a $200,000 forfeiture guarantee instead of the previously proposed

$500,000, and restrictions on the use of Harvey's assets by Ridge Manor for a limited period of time. Richter testified that the parties shook hands on the deal as set forth in the letter of intent. The parties also drafted and agreed to a press release for the following day, subject to AMEX approval, and, following the meeting, they conferred with officials of AMEX concerning the merger.

Shortly after noon on February 9, Unschuld purchased for his own account 500 shares of Harvey's stock at $17¼ per share.

The next day, February 10, prior to the issuance of the planned press release, Shapiro, Kaplan and Unschuld purchased for their own accounts substantial amounts of Harvey's stock at prices ranging from $16⅛ to $18⅜ per share. Shapiro's final purchase on that day (making a total of 3,000 shares purchased by him) occurred at 3:15 P.M., one minute before the press release appeared on the Dow Jones tape stating, in substance, that Harvey's was negotiating for "possible acquisitions" with a Florida land developer named Ridge Manor and an unnamed dress manufacturer. The price of Harvey's stock on February 10 closed at $18⅞, up to 2⅛ over the previous day's trading.

On February 11, officials of Harvey's and Ridge Manor again met to review the details of the merger and to prepare for a meeting with officials of AMEX scheduled for the following day. By the close of business on that day, Harvey's stock traded 22,100 shares, the highest daily volume for Harvey's since merger negotiations began. The price per share was up 1⅞ over the previous day's high.

Over the next several days, merger negotiations continued, with Friedland, Shapiro and Berman in constant contact with one another. On February 16, Shapiro made two more purchases of Harvey's shares, totalling 500 shares, at an average price of $22¾ per share, and Berman purchased 500 shares and 2 calls at $22 per share.

Then, on February 18, in compliance with a request from AMEX to make a public disclosure of the proposed merger, four announcements were made over the Dow Jones tape: the first, at 10:52 A.M., stated that Harvey's had agreed in principle to acquire Ridge Manor; the second, at 10:58 A.M., stated that Ridge Manor had earned $2.7 million on sales of $9.5 million in 1970; the third, at 11:54 A.M., stated that an expected 3-for-2 stock split would occur after the merger and that, if Harvey's and Ridge Manor had been "combined during the last year [1970] resultant per share earnings . . . were projected to be slightly in excess" of $2.50; and the fourth, in the late afternoon, stated that the merger was subject to AMEX approval.

On the same day, sometime after the third announcement, Berman made his seventh purchase of Harvey's, buying 500 shares at between $23⅝ and $23¾ per share. Earlier in the day, just prior to the first announcement, Kaplan also purchased 500 shares of Harvey's stock.

Thereafter, in mid-March, AMEX approved the Harvey's-Ridge Manor proposed merger, but on April 3, 1971, Harvey's agreed to merge with Liberty Circle, and two days later, the principals of Harvey's and Ridge Manor again met and, as a result of Friedland's dissatisfaction with the terms of the merger, Harvey's withdrew from the deal.

We turn now to a consideration of the S.E.C.'s claims on the merits.

The S.E.C.'s first contention is that defendants violated Section 10(b) of the Securities Exchange Act and Rule 10b–5 of the S.E.C. by failing to disclose to those from whom they purchased Harvey's stock, through the public market, material non-public information relating to the existence and progress of merger negotiations between Harvey's and Ridge Manor and the ramifications of such a merger, where knowledge of such information was gained as a result of their role as finders and their friendship with officials of both companies.

■ Section 10(b) of the Act and Rule 10b–5 are aimed at achieving a fair

and honest securities market by preventing those in possession of material inside information from using that information to their own advantage when dealing with others not possessing the same information. Thus, the statute requires that one in possession of material inside information about a company must either disclose it to the investing public before trading in the securities of that company, or, if he cannot or chooses not to disclose the information, he must abstain from trading in the securities concerned while such inside information remains undisclosed. Securities and Exch. Comm'n v. Texas Gulf Sulphur Co., 401 F.2d 833, 848 (2d Cir. 1968), cert. denied, Coates v. Securities and Exchange Commission, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

In the present case, defendants admit knowing about the proposed merger and concede that they were insiders within the ambit of those persons required by Section 10(b) and Rule 10b–5 to disclose material information. They contend, however, that the information known to them concerning the merger was not material information within the meaning of the securities laws and that, therefore, they had no obligation to disclose that information or to refrain from trading in Harvey's stock while it remained undisclosed.

Material information simply consists of facts which may affect the desire of reasonable investors to buy, sell or hold a company's securities. Securities and Exch. Comm'n v. Texas Gulf Sulphur Co., *supra,* 401 F.2d at 849. This obviously includes any facts which might affect the value of the company's stock, such as information about its earnings and distributions or events that might affect its future.

Defendants claim that the information known to them concerning the proposed merger was not material within the meaning of the securities laws because the actual possibility of a merger was so remote that information about it could not reasonably have influenced those with knowledge of it to change

their position with respect to Harvey's stock. In support of this contention, defendants emphasize that various contingencies remained before the merger could have been effectuated and that Rosenbloom and others were pessimistic about the chances that a merger would ultimately emerge from the negotiations. We find defendants' arguments unpersuasive.

We think the facts narrated above clearly show that the possibility of a merger between Harvey's and Ridge Manor was not remote and that defendants could not have considered it remote when they made their purchases of Harvey's stock. Even at the time of the earliest purchases on January 6, the facts indicate that the proposed merger could be considered a viable possibility. Ridge Manor's president and major shareholder, Joel Friedland, had shown great eagerness to merge his firm with Harvey's and at least one member of the Harvey's board, David Rosenbloom, was of like mind. A pro forma balance sheet for the combined firms, which had been prepared with the assistance of defendants, had shown the parties then involved in discussions that the merger would result in a significant earnings increase from 29¢ per share for Harvey's alone to $3 per share for the combined entity. Rosenbloom, pleased at the earnings projection, had agreed to present the proposal to his co-directors at Harvey's.

The series of events after January 6 made the likelihood of a merger even more distinct. On January 21, for example, Richter orally stated Harvey's terms for the merger and four days later Harvey's executive committee put those terms into writing in a letter that, according to Rosenbloom's testimony, represented a serious effort on the part of Harvey's to effect the merger. Friedland and defendants Shapiro and Berman themselves began making efforts to find the financing to meet those terms and appeared to be successful when Wilkens of Paul Revere indicated his firm's willingness to buy 100,000

shares. Finally, on February 9, a letter of intent was drawn up on which the parties shook hands, and Richter testified that the letter signalled that a "firm deal" had been reached by the parties. Manifestly, defendants' own conduct all through the negotiations belies their contention that they then considered the possibility of a merger remote. Defendants were actively engaged in effecting the merger by continually arranging meetings between the principals, by preparing the impressive pro forma balance sheet of the combined entity, and by seeking the financing to meet Harvey's terms. Further, defendants also knew that Harvey's was seriously considering merger with another company.

In view of these facts, we reject defendants' attempt to minimize the importance of information about the merger negotiations to those interested in Harvey's stock. Clearly, such information could have affected the decision of a Harvey's shareholder to hold or to sell his stock at that time. Three witnesses for the S.E.C., all of whom are sophisticated investors and all of whom sold Harvey's stock during this period, testified that had they been aware of the merger negotiations they would not have sold, and one of them, in fact, would have bought additional stock in Harvey's.

Further, the participants in the negotiations also considered the information material. Wilkens testified that the projected increase in earnings for Harvey's which would have resulted from the merger would have been a major corporate development for the firm and would have increased the market value of the stock and, on the basis of that, he recommended that his firm commit substantial funds to purchase stock in the merged entity. And Richter, in the February 5 memorandum to D. H. Blair's sales force, referred to his being "in possession of material information involving [Harvey's]."

■ Finally, and most convincingly, defendants' own conduct illustrates the materiality of the information. A major factor in determining whether events are material is the importance attached to them by those who knew about them. Securities and Exch. Comm'n v. Texas Gulf Sulphur Co., *supra*, 401 F.2d at 851. Here, the record reveals very significant juxtapositions between the timing of defendants' purchases and critical events in the negotiations. Defendants' first purchases came on the heels of their January 6 meeting with Rosenbloom, during which Rosenbloom remarked that the merger made sense and that he would bring the proposal to the attention of Harvey's board. Thereafter, the pace and quantity of defendants' purchases increased as developments grew more promising for an eventual merger.

■ Defendants claim that their purchases were based on an evaluation of criteria independent of the merger negotiations. We reject that claim since the timing of the purchases clearly suggests that they were based on knowledge of the proposed merger and of the effect it would have on the value of Harvey's stock. Even though other factors may have been evaluated, their inside knowledge must be considered the key and motivating element in their decisions to buy.

Further, that knowledge was not available to the public, and we think that this case presents precisely the situation which Section 10(b) and Rule 10b–5 were intended to prevent. Defendants took unfair advantage of their "inside" knowledge in their trading of Harvey's stock and exploited the uninformed public for their own profit. Indeed, that advantage proved highly profitable because the price of Harvey's common stock rose from approximately $7 per share on January 25, 1971 to $26 per share on February 17, 1971, one day before the first detailed merger announcement appeared, allowing Shapiro to reap some $28,000 in profits and Berman $14,950.

Accordingly, we find that the facts related to the existence and progress of

merger negotiations between Harvey's and Ridge Manor and the ramifications of such a merger were material within the meaning of the securities laws, and, consequently, that defendants violated those laws by failing to disclose those facts to the investing public before making purchases of Harvey's stock for themselves.

The S.E.C.'s second claim is that defendants violated Section 10(b) and Rule 10b–5 by passing material information to Frederick Robinson, Kaplan and Unschuld, who, in reliance thereon, purchased substantial amounts of Harvey's stock. This claim is based on the fact that the securities laws make it unlawful for one in possession of material inside information privately to pass it along to others in order that the "tipees" might benefit from that information. Securities and Exch. Comm'n v. Texas Gulf Sulphur Co., *supra*, 401 F.2d at 852. Here, again, defendants concede that they did give information about the merger to the three men in question, but they contend that the information was not material within the meaning of the securities laws and that, therefore, they did not violate those laws. However, in view of our finding that the merger information was material, we hold that in passing it along defendants Shapiro and Berman did violate Section 10(b) and Rule 10b–5.

Having determined that defendants violated the securities statute, we must next consider the relief which the S.E.C. seeks. The S.E.C. first seeks an injunction permanently enjoining defendants from future violations of Section 10(b) and Rule 10b–5.

This court has broad discretion to enjoin possible future violations of law where past violations have been shown and where the public interest requires the imposition of a permanent restraint. Securities and Exch. Comm'n v. Manor Nursing Centers, Inc., 458 F.2d 1082 (2d Cir. 1972); Securities and Exch. Comm'n v. Culpepper, 270 F.2d 241 (2d Cir. 1959). Such an injunction will issue upon a proper showing that there is a reasonable likelihood that the wrong will be repeated. Securities and Exch. Comm'n v. Manor Nursing Centers, Inc., *supra*. We think that there is such a showing of a reasonable likelihood in the present case.

The repeated and persistent violations found here were the result of information gained through defendants' activities as corporate "marriage brokers." We have received no indication that they plan to change professions or cease their business activities, thus putting them beyond the range of temptation. Moreover, the driving cupidity and lack of principle and restraint which they demonstrated as central figures in the negotiations by using privileged insider information for their personal gain and that of their friends manifestly calls for definite and formal restraints on their future conduct. The effect of such restraints on their business activities is clearly outweighed by the public interest involved in maintaining a fair and honest securities market and in sustaining public confidence in that market. Accordingly, we find permanent injunctive relief appropriate against both defendants.

The S.E.C. next seeks an order directing defendants to disgorge any profits realized by them from the unlawful transactions in Harvey's stock and to have those profits distributed to defrauded public investors.

Once the equity power of this court has been invoked by a showing of a violation of the securities laws, the court has the power to fashion appropriate relief. Clearly, it would defeat the purpose of the securities laws if an individual who violated Section 10(b) and Rule 10b–5 were allowed to keep the profits arising from the violation. Thus, effective enforcement of the law requires that the S.E.C. be able to make violations unprofitable by making violators disgorge their profits. Securities and Exch. Comm'n v. Manor Nursing Centers, Inc., *supra*. In light of that objective, we find disgorgement of the profits appropriate and necessary.

Accordingly, defendants are directed to pay over to the trustee already ap-

pointed with respect to the other defendants all actual profits derived from their trading in Harvey's stock while in possession of undisclosed inside information, plus interest thereon. Where defendants retained any Harvey's stock purchased while they were in possession of undisclosed inside information beyond February 18, 1971, they are directed to pay over to the trustee the difference between the mean average price of Harvey's common stock on the AMEX on February 18, 1971 and the purchase price of their shares, plus interest; and, in the case of calls, the aggregate of the purchase price and the cost of exercise, with interest from February 18, 1971.

The trustee shall use his best efforts to locate those members of the public who sold Harvey's shares during the period from January 6, 1971 to February 18, 1971 and pay each person so located, out of the sums deposited with the trustee, an amount to be determined by the trustee to be equitable and fair.

The foregoing constitutes this court's findings of fact and conclusions of law, as required by Rule 52, Fed.R.Civ.P.

Settle an order and judgment on ten (10) days' notice.