**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

**v.**

**Lavere Gilbert LUND, Defendant.**

**No. CV–81–371–MML.**

United States District Court,
C.D. California.

Sept. 16, 1983.

Robert M. Romano, Gary Lynch, Alexander Weir, III, Div. of Enforcement, S.E.C., Washington, D.C., Michael Stewart, Regional Administrator, S.E.C., Los Angeles, Cal., for plaintiff.

Roderick M. Hills, Robert K. Burgess, Michael Chertoff, of Latham, Watkins & Hills, Washington, D.C., for defendant.

## OPINION

LUCAS, District Judge.

This action arises under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5. Plaintiff, the Securities and Exchange Commission ("SEC"), contends that defendant Lavere Gilbert Lund ("Lund") purchased shares of a publicly traded company, P & F Industries, Inc. ("P & F"), after receiving material, nonpublic corporate information concerning the corporation. This information was allegedly given to Lund by his long time friend and business associate, Sidney Horowitz ("Horowitz"), a P & F insider. The SEC argues that Lund should have disclosed this information prior to purchasing the stock or refrained from trading in the stock and that, by not doing so, Lund violated § 10(b) and Rule 10b–5. Plaintiff seeks injunctive relief and an order requiring Lund to dis-

gorge the profits he made from the purchase and subsequent sale of the stock.

Lund contends that he purchased the stock before receiving any information from Horowitz. Lund also argues that even if he is found to have purchased the stock after receiving information concerning P & F, the information was not material and/or was already public information. He further contends that even if the Court finds the material to have been material and nonpublic, his purchase does not constitute a violation of § 10(b) because he lacked the requisite scienter. Finally, Lund argues that, under these facts, § 10(b) does not prohibit him from knowingly trading on material, nonpublic information. Lund also asserts that, in any event, injunctive relief is not appropriate in this case.

The action was tried to the Court in a three day trial.[1] The court has carefully considered the testimony and other evidence presented by both parties as well as the briefs and oral argument of counsel and finds the facts during the relevant period of time to have been as follows.

Lund was the Chief Executive Officer, President, and Chairman of the Board of Directors of Verit Industries ("Verit"). Horowitz was also a member of Verit's Board and had been for at least seven years. Horowitz was also P & F's Chief Executive Officer and President as well as Chairman of its Board of Directors. Prior to the events at issue in this litigation, Lund regularly spoke with Horowitz and they often exchanged information about Verit and P & F.

Beginning in May or June of 1979, Horowitz, on behalf of P & F, entered into negotiations with the Jockey Club Casino Corporation ("Jockey Club") concerning a joint venture involving a gambling casino in Las Vegas. During the negotiations Ho-

---

1. The matter was taken under submission at the conclusion of the trial. On July 1, 1983 the Supreme Court announced its decision in *Dirks v. SEC,* —— U.S. ——, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). At the request of both parties, the court permitted the filing of supplemental briefs addressing the impact of the *Dirks* decision on this case. Counsel for defendant has requested that the Court hear oral argument on the issues raised by the *Dirks* decision. The Court has considered the papers filed and has determined that oral argument is not required.

rowitz told his family, the P & F Board of Directors, and Lund about a possible project involving gambling.

At some point in May or June of 1979 Lund spoke with Steven Antebi ("Antebi"), a stock broker with Bear, Stearns & Co. in Los Angeles and asked Antebi about P & F. Antebi stated that he was not familiar with the company. Lund, whose account at Bear, Stearns & Co. had been inactive for some time, made no purchase of P & F stock in connection with this conversation.

By the beginning of August, 1979, Horowitz was quite confident that the P & F/Jockey Club casino venture would go forward. On Thursday afternoon, August 2, 1979, Horowitz called Lund. Lund was not in his office at the time, however, so Horowitz left a message that he had called. Lund did not return the call on August 2, 1979. On Friday morning, August 3, 1979, Antebi called Lund. Remembering Lund's interest in P & F in May or June, Antebi wanted to inform Lund that P & F stock was trading heavily. He also asked Lund if he wished to purchase any P & F stock. Lund purchased no stock at this time. After the call from Antebi, Lund returned Horowitz' call. Horowitz told Lund about the negotiations with the Jockey Club in detail and asked if Verit[2] would be interested in providing a capital investment of $600,000 for the venture.[3] He also stated that the final meeting with the Jockey Club representatives would be held on Monday, August 6, 1979. At this meeting the parties were to draft a formal letter of intent which would be presented to the P & F Board the same day. If the Board approved the joint venture, the letter of intent would be signed immediately following the Board meeting. Lund told Horowitz that he would consider the offer to participate in the joint venture.

After Lund talked to Horowitz, Antebi called again, this time with information concerning the size of the market for P & F stock. Lund then placed an order to purchase 10,000 shares.[4] This was Lund's only purchase of P & F stock in approximately ten years. Lund's order was executed shortly after his conversation with Antebi at a price of $1.25 per share.

The joint venture with Jockey Club was approved by P & F's Board on August 6, 1979 and a letter of intent was signed on that day. The American Stock Exchange delayed opening of trading in P & F stock until 2:52 Eastern Time pending the public announcement of the joint venture. When trading opened, the trading volume and price of P & F stock rose dramatically and remained high for some weeks.

Horowitz called Lund late on the afternoon of Monday, August 6, 1979 to ask again if Verit was interested in participating in the casino project. During this phone conversation Lund told Horowitz that he was glad the letter of intent had been signed because he had purchased some P & F stock on Friday. Horowitz indicated to Lund that he did not think it was proper for Lund to have purchased the stock. Lund immediately volunteered to sell the stock and did so in two equal blocks over the next two days. Lund sold his shares at an average price of $2.50 per share. His total profit, therefore, was $1.25 per share, or $12,500.

The Court must now consider whether, under these facts, Lund's purchase consti-

---

2. Lund testified that Horowitz asked not whether Verit would be interested in participating in the joint venture but rather whether Lund personally was interested. Although the Court finds that Horowitz offered the opportunity to Verit rather than to Lund personally, the same analysis would seem to apply regardless of whether the offer was made to Verit, Lund or to both.

3. Lund testified that, as he now recalled the conversation, Horowitz told him that he should invest in a new Jockey Club condominium project underway in Las Vegas. The Court finds this testimony to be unsupported by the other evidence presented at trial.

4. Lund argued at trial that, given the time periods involved, the P & F purchase order could not have been placed after the telephone call to Horowitz. The evidence presented at trial does not support this argument.

tutes a violation of § 10(b). As indicated above, this requires the Court to determine:

(a) whether the information Lund received was material, nonpublic information;

(b) whether Lund had the requisite scienter; and

(c) if the Court answers these initial questions in the affirmative,[5] whether Lund's failure to disclose the information before trading is otherwise actionable under § 10(b).

The Court will address each of these issues in turn.

■■■ Information is material if there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision. *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Zweig v. Hearst Corp.,* 594 F.2d 1261, 1266 (9th Cir.1979). Certainly a reasonable investor would have considered P & F's participation in a joint venture involving a gambling casino to be important. Lund received specific information about a definite project. The proposed joint venture was a major undertaking for P & F which would have a significant effect on the value of its assets and its earnings potential.[6] The fact that Lund purchased a substantial amount of P & F stock after receiving this information and that this was his only purchase of P & F stock in approximately ten years further indicates that the information was material. *See SEC v. Shapiro,* 494 F.2d 1301, 1307 (2d Cir.1974). Finally, the rapid increase in the trading volume and price of P & F stock following the disclosure of the joint venture confirms the conclusion that a reasonable investor would

have considered this information to be important in making an investment decision with respect to P & F stock. The Court finds, therefore, that the information which Lund received from Horowitz was material *information.*

■■■ The Court also finds that this information was nonpublic. Lund was told on August 3, 1979 that the end of a negotiations period had been reached and that a definite agreement was imminent. He was told that a letter of intent would in all likelihood be signed on the next business day. There is no evidence that this specific information had been made public. The fact that some general information concerning the possibility of a P & F project involving gambling had been disclosed to a limited segment of the public in the previous months does not convert the very specific information which Lund received from Horowitz into public information.

■■■ Lund also argues that he lacked the requisite scienter to sustain a finding of liability under § 10(b). It is well established in this Circuit that § 10(b) proscribes only intentional or reckless misconduct. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Pegasus Fund, Inc. v. Laraneta,* 617 F.2d 1335, 1340 (9th Cir.1980); *Nelson v. Serwold,* 576 F.2d 1332, 1337 (9th Cir.) *cert. denied,* 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978). Lund contends that he did not know and was not reckless in not knowing that the information he received from Horowitz was material, nonpublic information. Thus, Lund argues, he cannot be subject to liability under § 10(b). This argument is unsupported by the evidence

---

**5.** It is clear that the other, more "technical" prerequisites of § 10(b) liability are met in this case; that is, Lund's failure to disclose occurred, "in connection with the purchase or sale of [a] security" and Lund used a "means or instrumentality of interstate commerce ... or of [a] facility of [a] national securities exchange" in executing his purchase order. 17 C.F.R. § 240.10b–5.

**6.** Lund argued that the joint venture was so speculative that the information provided by Horowitz was not material. Although the

probability that a future event will occur may be considered in determining whether information concerning that event is material, the Court finds that the element of speculation as to the eventual success of the joint venture was not so significant as to render unimportant the fact that the parties had agreed to undertake the joint venture. *See SEC v. Shapiro,* 494 F.2d 1301 (2d Cir.1974) (information concerning a possible merger held to be material even though the merger was not completed).

presented at trial. The Court finds that Lund knew that the information he received from Horowitz was material, non-public information and that he purchased the P & F stock in order to take advantage of this information.

■ The Court must now address the more difficult issue raised by this litigation: Lund's contention that under these facts his failure to disclose the information he received or to refrain from trading in P & F stock does not constitute a violation of § 10(b).

The scope of liability under § 10(b) has received much attention in recent years. In particular, the Supreme Court's decisions in *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) and *Dirks v. SEC,* ——— U.S. ———, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), have significantly clarified the parameters of such liability.

It has long been established that, under certain circumstances, a "tippee" may be held liable under § 10 for trading on material, non-public information. *See Kuehnert v. Texstar Corp.,* 412 F.2d 700 (5th Cir. 1969). However, the precise contours of tippee liability were unclear until *Dirks.* Under *Dirks* tippee liability cannot be imposed unless the "tipper" has breached a fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach. *Dirks, supra.*

■ Following the publication of *Dirks,* plaintiff correctly abandoned its argument that Lund could be held liable under § 10(b) on a theory of tippee liability. It is clear in this case that Horowitz did not breach his fiduciary duty to P & F or its shareholders by disclosing information concerning the Jockey Club joint venture to Lund. His disclosure of this information was within the scope of his authority as an officer and director of the corporation. Absent a breach of a fiduciary duty by Horowitz, Lund cannot be liable under § 10(b) as a tippee.

■ This determination does not end the Court's inquiry, however. In addition to "tippee" liability discussed above, courts have long imposed liability under § 10(b) in cases of "insider" trading. *See In re Cady Roberts & Co.,* 40 S.E.C. 907 (1961); *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir.1968), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971). Although corporate insiders are traditionally defined as officers, directors and controlling shareholders of the corporation, a consistent body of case law makes clear that the scope of the concept "insider" is flexible. In one of the earliest "disclose or abstain" cases, *Cady Roberts, supra,* the Commission specifically stated that these three groups "do not exhaust the classes of persons upon whom there is [an obligation to disclose or abstain.]" The commission stated that the scope of the disclose or abstain rule is not "circumscribed by fine distinctions and rigid classifications." *Id.* Rather, the prohibition against insider trading is directed at "those persons who are in a special relationship with the company and privy to its internal affairs." *Id.*

This flexible understanding of the scope of the concept "insider" for the purposes of § 10(b) has been confirmed by this Circuit and by the Supreme Court. In *Feldman v. Simkins Industries, Inc.,* 679 F.2d 1299 (9th Cir.1982) the court stated:

> Insider status is normally reserved for officers, directors, controlling shareholders of a corporation *or to [sic] those having a special relationship affording access to inside information.*
> *The test to determine insider status is whether the person has access to confidential information intended to be available only for a corporate purpose and not for the personal benefit of anyone.*

Id., at 1304 (citations omitted) (emphasis supplied).

Similarly, in *Dirks,* the Supreme Court noted that "outsiders" may, under certain circumstances, become fiduciaries of shareholders and, thus become subject to the same duty to disclose or abstain as an insider. The Court stated that

> [t]he basis for recognizing this fiduciary duty is not simply that such persons ac-

quired nonpublic corporate information, but rather that they have entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes .... For such a duty to be imposed, however, the corporation must expect the outsider to keep the disclosed nonpublic information confidential, and the relationship at least must imply such a duty.

*Id.,* at —— n. 14, 103 S.Ct. at 3261 n. 14.

Persons who, although not traditional "insiders", nevertheless become fiduciaries of the corporation and the shareholders could be called "temporary insiders." [7] They assume the duties of an insider temporarily, by virtue of a special relationship with the corporation. A temporary insider is subject to liability under § 10(b) for trading on the basis of nonpublic material information received in the context of the special relationship.

■ The Court has concluded that Lund was a temporary P & F insider when he traded on the basis of the information concerning the Jockey Club project. Lund and Horowitz were long time friends and business associates. They often exchanged information about their corporations. Horowitz sat on the Board of Verit. Horowitz told Verit, through Lund, of the Jockey Club joint Venture because of this special relationship. The information was made available to Lund solely for corporate purposes. It was not disclosed in idle conversation or for some other purpose. The relationship between Horowitz and Lund was such as to imply that the information was to be kept confidential. Horowitz clearly did not expect Lund to make the information public or to use the information for his personal gain. Lund knew or should have known that the information he received was confidential and that it had been disclosed to him solely for legitimate corporate purposes.

Under these circumstances, Lund became a temporary P & F insider upon receipt of the information concerning the Jockey Club project and assumed an insider's duty to "disclose or abstain" from trading based on that information. Lund's breach of that duty is actionable under § 10(b).

■ Having determined that Lund violated § 10(b) by trading in P & F stock the Court must now consider the appropriate relief to be granted in this action. Plaintiff seeks both a permanent injunction against further securities law violations and an order requiring Lund to disgorge his profits of $12,500.00. Each of these prayers for relief must be addressed in turn.

The standards for determining whether injunctive relief is appropriate have been clearly and concisely discussed in *SEC v. Murphy,* 626 F.2d 633 (9th Cir.1980):

> In order to obtain a permanent injunction ... the SEC [has] the burden of showing there [is] a reasonable likelihood of future violations of the securities laws. The existence of past violations may give rise to an inference that there will be future violations;
>
> and the fact that the defendant is currently complying with the securities laws does not preclude an injunction. In predicting the likelihood of future violations, a court must assess the totality of the circumstances surrounding the defendant and his violations, and it considers factors such as the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; and the likelihood, because of the defendant's professional occupation, that future violations might occur; and the sincerity of his assurances against future violations.

*Id.,* 626 F.2d at 655 (citations omitted).

Although the evidence presented at trial showed that Lund knowingly traded on ma-

---

**7.** They might also be called "quasi-insiders." However, that term has been used in the ALI Federal Securities Code Official Draft to refer to those who receive inside information but who do not have a special relationship to the corporation which provides them with access to this information (e.g. printers, government officials, law clerks). *See* ALI Federal Securities Code § 1603, comment 3(d) at 663 (Proposed Official Draft 1978) (1980 ed.).

terial nonpublic information, the circumstances surrounding this trade suggest that it was an isolated occurrence.[8] Lund simply saw an opportunity and took it. Although Lund has never admitted the conduct, or that it was wrongful, the Court finds that this is not evidence of a propensity to commit future violations.[9] Lund indicates that he intends and has always intended to comply with the requirements of the federal securities laws. His profession is not likely to lead him into future violations. Upon consideration of all of the facts and circumstances, the Court concludes that plaintiff has failed to meet its burden in seeking permanent injunctive relief. Plaintiff's prayer for such relief is, therefore, denied.

 The Court must now consider plaintiff's request for an order requiring Lund to disgorge the profits he earned from his illegal trading in P & F stock. It is now well established that the Court may, in the exercise of its equitable powers, order disgorgement in an SEC enforcement action. *See, e.g. SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 102 (2d Cir. 1978); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1103–04 (2d Cir.1972); *SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1307–08 (2d Cir.1971), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971); *SEC v. Penn Central Co.,* 450 F.Supp. 908, 916–18 (E.D.Pa.1978). Where liability under § 10(b) has been established the Court should fashion relief structured to deprive the defendant of all gains flowing from the illegal activity. Disgorgement of Lund's profit of $12,500.00 is, therefore, appropriate. In addition, the Court orders that

Lund disgorge interest on this amount from August 8, 1979 at the legal rate of prejudgment interest under California law. *See, Manor Nursing Centers, Inc., supra,* 458 F.2d at 1105. This is necessary to ensure that Lund does not profit from his illegal activity.

 In the few cases in which the practical details of the disgorgement have been discussed, the court has ordered the amount in question to be paid into an escrow account to be supervised by a trustee or receiver. *See, e.g., SEC v. Commonwealth Chemical Securities, Inc.,* 410 F.Supp. 1002, 1021 (S.D.N.Y.1976) *aff'd in part in Commonwealth Chemical Securities, supra; SEC v. R.J. Allen & As., Inc.,* 386 F.Supp. 866, 880–81 (S.D.Fla.1974); *SEC v. Shapiro,* 349 F.Supp. 46, 55–56 (S.D.N.Y.1972), *affirmed in SEC v. Shapiro, supra.* The receiver or trustee, in addition to handling other duties if necessary, is given the task of locating those members of the public who were injured by the illegal activity and to pay each injured party an amount determined by the trustee to be fair and equitable. The Court has determined that a similar procedure would be appropriate in the present case. The Court, therefore, orders Lund to pay $12,500.00 plus interest into an escrow account. The magistrate assigned to this case is to act as trustee of this account and to determine whether or not it is feasible to locate those members of the public who were harmed by Lund's conduct. If this is feasible, the magistrate shall use his best efforts to locate these persons and to make such an award from the escrow account as is fair and equitable. Plaintiff

---

**8.** The SEC introduced evidence which also allegedly showed that Lund purchased shares of his own corporation, Verit, on the basis of inside information. The bulk of these purchases, however, were executed as a result of standing orders placed long before Lund would have had any relevant inside information. These purchases do not appear therefore, to have been made in violation of § 10(b). Only Lund's purchase of Verit stock on April 21, 1980, was not made as the result of a standing order. The Court finds that as to these shares any inside information Lund may have had about a small upward trend in earnings was

not material information. No § 10(b) violation could therefore be shown from these facts.

The SEC also introduced evidence tending to show that Lund failed to register his trading in Verit in accordance with federal law. However, these irregularities appear to be isolated, technical failures which do not necessarily indicate a likelihood of future violations.

**9.** *Cf. SEC v. Murphy,* 626 F.2d 633, 656 (9th Cir.1980) (imposition of permanent injunction affirmed in part on the grounds that the defendant insisted that he had done nothing wrong.)

shall assist the trustee in these tasks. Any amount remaining in the escrow account after one year shall be paid into the United States Treasury. If the magistrate determines that it is not feasible to locate those members of the public who were harmed by Lund's conduct, he may order the escrow funds to be paid into the United States Treasury at an earlier time.

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the Clerk shall serve, by United States mail, copies of this Order on counsel for the parties in this matter.