**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Marvin Hayle INGRAM, Defendant.**

**No. 87–4044–SVW(Tx).**

United States District Court, C.D. California.

May 3, 1988.

**1438**

Robert D. LaFramenta, Bette J. Roth, John Koutsos, S.E.C., Los Angeles, Cal., for plaintiff.

Charles T. Rose, Law Offices of Charles T. Rose, Mission Viejo, Cal., for defendant.

## MEMORANDUM AND ORDER

WILSON, District Judge.

### FACTUAL AND PROCEDURAL BACKGROUND

The Securities and Exchange Commission brought this action for injunctive and other equitable relief against Marvin Ingram claiming that Ingram violated the federal securities laws, specifically Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. 240, 10b–5. The SEC alleged that Ingram, as an insider to Specialized Systems, Inc. ("SSI"), communicated material nonpublic information to several of his clients who later purchased SSI stock. Ingram has been a broker since 1969 and had advised customers to buy SSI stock since 1980.

In December 1984, Ingram telephonically contacted Steven Nemergut, who earlier that year became SSI's president. Ingram annually contacted the president of SSI for a review of the company's developments but had never spoken to Nemergut before. While informally discussing SSI, Nemergut told Ingram that he was looking for a merger partner and Ingram said he would keep his eyes open.[1] In February 1985, Ingram was told by Paula McHale, described as a "finder", that Tauran Industries (Tauran), her client, was looking for a merger partner. Ingram then arranged a meeting between John Nacos, an officer of Tauran, and Nemergut.

Between February 16 and 28, several meetings took place between SSI and Tauran representatives. During this period, SSI furnished Tauran with a proposed stock exchange agreement and later discussed terms of the proposed merger. Tauran also revealed to SSI that it had a joint venture agreement with the People's Republic of China for the development of a fiberglass plastic manufacturing facility which was expected to produce over 100 million dollars annually.

The evidence is unclear as to the extent of Ingram's participation or knowledge of the substance of these meetings. Ingram did attend portions of some meetings in which preliminary merger discussions were held but, according to Nemergut, Ingram absented himself when he (Ingram) thought the discussion was becoming too specific.

---

**1.** Nemergut did not offer to compensate Ingram to find an appropriate partner, nor was there any understanding or discussion about future compensation. There was a discussion, later aborted, regarding a possible seat for Ingram on SSI's board.

While Ingram's role on behalf of SSI remains somewhat of an enigma, it does appear he was asked by Nemergut at one meeting about what form the proposed stock exchange should take. He also was functioning as an emissary for Nemergut in that he arranged some of the meetings between February 16 and 28. It could also be inferred that he counseled Nemergut because he spoke with him several times a day.[2]

Discussions between Tauran and SSI broke down around February 24. They were subsequently resumed between February 26 and 27 when an agreement was reached. While Ingram was aware the negotiations broke down, Nemergut was unsure when he told Ingram that the merger was back on course.

The SEC relied upon two of Ingram's customers to establish that they were induced to buy SSI stock because of information Ingram disseminated regarding the merger discussions. One customer, Richard Lindsay, who bought SSI stock on February 21 when merger discussions were at a preliminary stage, already owned SSI stock long before Tauran was on the scene. The other customer witness, David Kitsis, purchased SSI stock on February 27; however, as noted above, it is unclear whether Ingram knew at that time that the merger discussions were revived and that an agreement had been reached.

On February 28, 1985, SSI publicly announced its merger agreement with Tauran. The announcement also publicly revealed Tauran's joint venture agreement with China. On March 18, 1985, the agreement between SSI and Tauran came apart and their merger was never consumated.

## DISCUSSION

■■■ Under Rule 10b–5, a securities violation will occur when there is a communication of material, nonpublic information in breach of an established duty. *Dirks v. S.E.C.*, 463 U.S. 646, 653, 103 S.Ct. 3255, 3260–61, 77 L.Ed.2d 911 (1983). This duty arises from the existence of a fiduciary

relationship. *Id.* at 654, 103 S.Ct. at 3261. Generally, courts consider the following factors in determining whether an insider trading violation has occurred: 1) whether the alleged violator is an "insider"; 2) whether the information communicated is material; 3) whether the information is nonpublic, and 4) whether the alleged violator exhibited the requisite scienter. The Court finds the SEC has established a violation of Rule 10b–5.

### A. *Insider Status*

The Supreme Court has held that to find a Rule 10b–5 violation, there must be 1) a relationship affording access to inside information intended to be available only for a corporate purpose, and 2) unfairness in allowing the corporate insider to take advantage of that information by trading without disclosure. *See United States v. Chiarella*, 445 U.S. 222, 247, 100 S.Ct. 1108, 1124, 63 L.Ed.2d 348 (1980). *Chiarella* marked a major shift in the law applicable to inside trading. Prior to *Chiarella*, the SEC and some courts' position was premised merely upon the unfairness of trading while in possession of information not available to the marketplace. In *Chiarella*, the Court found that a duty to disclose does not necessarily result from mere possession of such information. Rather, such a duty arises from the existence of a fiduciary relationship. *Id.* at 227–235, 100 S.Ct. at 1114–18.

Following *Chiarella*, the Court further defined the scope of such a fiduciary relationship. In *Dirks v. SEC, supra*, the Court suggested that several corporate relationships may satisfy the insider status required to find a 10b–5 violation. In its often-cited footnote 14, the Court said the following:

> Under certain circumstances, such as where corporate information is revealed legitimately to an underwriter, accountant, lawyer, or consultant *working for the corporation*, these outsiders may become fiduciaries of the shareholders. The basis for recognizing this fiduciary

---

**2.** However, other than being asked about the form of the stock exchange, there was no direct

evidence as to what matters he advised upon during that critical period.

duty is not simply that such persons acquired nonpublic corporate information, but rather that they have entered into a *special confidential relationship* in the conduct of the business of the enterprise and are given access to information solely for corporate purposes.... *For such a duty to be imposed, however, the corporation must expect the outsider to keep the disclosed nonpublic information confidential,* and the relationship *at least must imply such a duty.*

*Dirks,* 463 U.S. at 655 n. 14, 103 S.Ct. at 3262 n. 14. (emphasis supplied). Although the Court attempted to broaden insider status beyond those professional persons paid by the corporation, the language employed appears to suggest that an expectation of confidentiality would not, in itself, create a fiduciary relationship. The last line of footnote 14 demonstrates that there must also be some sort of special relationship from which an objective person would conclude that a confidential relationship exists. The Court did not, however define the parameters of such a special relationship. *Id.* at 660, 103 S.Ct. at 3264.

Seizing the language in *Dirks* which creates insider status when a "special relationship" exists between a corporation and an individual, some courts have tried to enlarge the scope of the insider relationship. In particular, several courts have classified various non-professional, non-insiders as "constructive insiders" for purposes of Rule 10b–5.

In *SEC v. Lund,* 570 F.Supp. 1397 (C.D. Cal.1983) the court relied upon Ninth Circuit authority created prior to *Dirks* for the proposition that the test used to determine insider status is whether "the person has access to confidential information intended to be available only for a corporate purpose and not for the personal benefit of anyone." *SEC v. Lund, Id.* at 1402 *citing*

*Feldman v. Simkins Industries, Inc.,* 679 F.2d 1299, 1304 (9th Cir.1982). Combining this definition with that found in *Dirks,* the district court found that persons who are not traditional insiders can still be considered fiduciaries and responsible for the securities laws under 10b–5 if they become what the court called "temporary insiders." *SEC v. Lund,* 570 F.Supp. at 1403. The court added that such a person would "assume the duties of an insider temporarily, by virtue of a special relationship with the corporation." *Id.* at 1403.[3]

■ In applying the governing legal standard as described above, the Court finds that Ingram was an insider. Nemergut testified that he considered the merger negotiations confidential and he expected that Ingram would also treat the negotiations as confidential. Ingram also achieved a "special relationship" with SSI for three reasons: (1) he was allowed to attend meetings during the critical period between February 16 and 28; (2) he advised Nemergut on at least some aspects of the merger; and (3) he helped arrange some of the important meetings during the critical period.

2. *Materiality*

■ To establish whether the nonpublic disclosure is material, the Supreme Court has developed a test which examines the effect of disclosure on the reasonable investor. In *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), the Court established that:

an omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important ... put another way, there must be a substantial likelihood that the omitted

**3.** *Lund* differs from the instant case in that the evidence there firmly established that the insider knew before the trade that the merger was *a fait accompli.* In the instant case, it is unclear whether Ingram knew that a merger was definite. Also, Lund and Horowitz had a long and close personal relationship. Based upon that relationship, *Lund* could be considered nothing more than a traditional tipper-tippee case.

What the Court seems to be saying in *Lund* is that anytime a person is given information by an issuer with an expectation of confidentiality or limited use, he becomes an insider of the issuer. But under *Dirks,* that is not enough; the individual must have expressly or impliedly entered into a fiduciary relationship with the issuer.

fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information made available.

*Id.* at 449, 96 S.Ct. at 2132.

The Ninth Circuit echoed this standard, and added that the materiality of preliminary negotiations depends on the facts of a particular case. *Grigsby v. CMI Corp.,* 765 F.2d 1369, 1373 (9th Cir.1985). In *SEC v. Geon Industries, Inc.,* 531 F.2d 39 (2nd Cir.1976), relied upon by the *Grigsby* court, the court stated that:

As we said in *SEC v. Shapiro,* 494 F.2d 1301, 1306 (2d Cir.1974), another insider case, the application of this test implies that there is '[no] specific rule as to when information respecting a merger becomes material,' but rather indicates that each case must be approached on its own facts. Since a merger in which it is bought out is the most important event that can occur in a small corporation's life, to wit, its death, we think that inside information, as regards a merger of this sort, can become material in an earlier stage than would be the case as regards lesser transactions—and this even though the mortality rate of mergers in such formative stages is doubtless high.

*Id.* at 47.[4]

Here, the information given to Ingram's clients had the effect of altering the total mix of information available to them. The prospect of the merger would clearly influence a potential buyer that a particular stock would rise in value. Further, the fact that significant purchases were made after years of only marginal trading indicates that the information was material. *See Lund,* 570 F.Supp. at 1401.

### 3. *The Information was Nonpublic*

■ There was no evidence that anyone other than SSI (including Ingram) and Tauran representatives was aware of the ongoing merger negotiations between February 16 and 28. While Nemergut may have earlier told another broker about his general interest in finding a merger partner for SSI, the specifics of the negotiations between SSI and Tauran were not revealed to the public and efforts were made to keep them non-public. *See Id.* at 1401.

### 4. *Scienter*

■ Rule 10b–5 proscribes only intentional or reckless conduct. *SEC v. Burns,* 816 F.2d 471, 474 (9th Cir.1987); *Bell v. Cameron Meadows Land Co.,* 669 F.2d 1278 (9th Cir.1979); *Lund,* 570 F.Supp. at 1401. Thus, the SEC must show that the alleged violator knowingly or recklessly intended to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1380–81, 47 L.Ed.2d 668 (1976).

■ Three factors working in combination demonstrate that Ingram acted with the requisite scienter. First, Ingram was an experienced stock broker. Second, he knew he was treading on dangerous turf as he left the room whenever he believed the conversation could implicate him in a securities violation. Third, and most telling, he told a customer that "I really shouldn't be telling you this."[5]

**4.** *Cf. Basic Inc., et al. v. Levinson, et al.,* —— U.S. ——, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) where the Court rejected an "agreement-in-principle" test under which preliminary merger discussions would not become material until the would-be merger partners reach agreement as to price and structure of the transaction.

**5.** The Court notes that there is little authority discussing the scienter requirement in the context of insider trading cases. In determining the defendant's subjective intent, the Court has examined various objective indicia, most notably the materiality of the information disclosed. It appears to the Court that the degree of materiality of the information possessed by the alleged insider could affect the analysis of scienter; the more significant the information the more likely the insider was aware that he was conferring a benefit or breaching a duty. The Court's view is that as the materiality (importance) of the information increases, the more likely the insider is aware that he is conferring a benefit or breaching a duty.

*Remedies*

In calculating the appropriate remedy, the trial court has broad discretion to fashion any penalty or remedial measure that will equitably serve the deterrent effect of the securities laws. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir.1972). The Ninth Circuit suggests that "[I]t is for the district judge, after becoming aware of the nature of the case, to determine the appropriate measure of damages in the first instance ... [T]he court's function is to fashion the remedy best suited to the harm". *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615 (9th Cir.1981).

■ The SEC requested a permanent injunction against Ingram, disgorgement of any and all commissions he received through the stock purchases, and civil penalties (15 U.S.C § 78u(d)(2)(A)). While the Court finds that a permanent injunction and penalties are inappropriate remedies under the facts of this case, disgorgement of Ingram's commissions is warranted.[6] With reference to an order to disgorge illegally gained profits, the court will be limited to the amount by which the defendant profited from his wrong plus interest. *SEC v. Randolph*, 564 F.Supp. 137, 142 (N.D.Cal.1983), *rev'd on other grounds*, 736 F.2d 525 (9th Cir.1984).

In *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir.1980), the court noted that in order to obtain a permanent injunction, the SEC maintains the burden of showing a "reasonable likelihood of future violations of the securities laws." The *Murphy* court set forth a list of factors to be considered on reviewing a request for permanent injunction: (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of the defendant's professional occupation, that future infractions might occur; and (5) the sincerity of his assurances against future violations. *Id.* The court stated that these factors should be utilized as a guide, and any determination should consider the "totality of the circumstances". *Id.*

In deciding not to grant an injunction, this Court relies upon the following factors: this was Ingram's first violation during his 19 years as a broker; the evidence of "scienter," while sufficient for finding a violation, was not overwhelming; Ingram had been recommending SSI stock as an investment for his customers over a five year period before the merger discussions; he did not personally purchase SSI stock; his total financial gain was small; and, finally, Ingram appeared to the Court to be genuinely contrite and repentant for what occurred. Accordingly, the Court concludes that based upon the totality of circumstances there is no reasonable likelihood of future securities law violations. *See Lund*, supra, 570 F.Supp. 1397.

■ Although this Court decided against issuing an injunction, the Court can still properly consider the SEC's request for ancillary relief in the form of disgorgement. *SEC v. Commonwealth Chemical Securities, Inc., et al.*, 574 F.2d 90, 103 n. 13 (2nd Cir.1978). *SEC v. Manor Nursing Center Inc.*, 458 F.2d 1082 (2nd Cir.1972).

Accordingly, the Court ORDERS that Ingram disgorge the commissions he earned ($1,150.00) as a result of the Lindsay and Kitsis stock transactions described above.

---

6. The Court recognizes that at oral argument it indicated that it was disinclined to order ancillary relief. However, upon further reflection, the Court believes that disgorgement is appropriate.