SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Edward R. DOWNE, Jr., Steven A. Greenberg, Martin Revson, David Salamone, Fred R. Sullivan, Thomas Warde, Milton Weinger and Broadsword, Ltd., Defendants.

No. 92 Civ. 4092 (SAS).

United States District Court,
S.D. New York.

June 17, 1997.

Carmen J. Lawrence, Regional Director, Barry W. Rashkover, Securities and Exchange Commission, New York City, for Plaintiff.

Thomas P. Puccio, Law Offices of Thomas P. Puccio, New York City, for Defendants.

### OPINION & ORDER

SCHEINDLIN, District Judge.

After a three day jury trial, defendant Thomas Warde ("Warde") was found liable for insider trading in violation of §§ 10(b) and 14(e) of the Securities and Exchange Act of 1934, and Rules 10b–5 and 14e–3 thereunder. Defendant now moves for judgment notwithstanding the verdict under Fed. R.Civ.P. 50(b). The Securities and Exchange Commission ("SEC") moves for a permanent injunction, and for an order directing disgorgement, assessing prejudgment interest, and imposing a civil penalty of three times the gross profits of all trades resulting from the use of inside information. For the reasons set forth below, defendant's motion is denied. A permanent injunction will issue against Warde. Warde will also make a disgorgement in the amount of $871,725, on which Warde will pay prejudgment interest of $1,264,501, based on the Internal Revenue Service rate used for underpayment of taxes. Finally, Warde will pay a penalty of $871,725.

## I. FACTUAL BACKGROUND

This case arises from substantial trading in warrants to purchase the common stock of Kidde, Inc. ("Kidde") during a period in 1987 when control of Kidde was in flux. At trial, the SEC contended that Warde purchased Kidde warrants while in possession of material, non-public information about a tender offer for Kidde securities. The SEC further contended that Warde received this information from Edward Downe ("Downe"), a Kidde Director throughout the relevant period. Warde is also alleged to have tipped his brother Gregory Warde, who also traded on the information.

Warde and Downe were introduced by Charlotte Ford, Downe's former wife and Warde's close friend, in the early 1980's. By 1987, according to Downe, the two men had become good friends. Trial Transcript ("Tr.") 135. They would socialize several times a year, either when Downe and Ford were at their home in Sun Valley, Idaho, or when Warde and his wife would visit New York. Tr. 135–36. Together, they played cards, and discussed subjects ranging from art to the stock market. Tr. 136, 291. Investing served as the principal source of income for both men: Downe had sold a publishing business several years before, while Warde's family's real estate business had suffered a "depression" in the mid–80's, causing him to focus more on securities markets. Tr. 130, 380.

Edward Downe became a Kidde Director in 1986, at the request of his friend Fred Sullivan ("Sullivan"), President of Kidde for over twenty years. *See* Tr. 65–66, 73–74, 142. In early June 1987, Sullivan had consulted with Bear Stearns Companies, Inc. ("Bear Stearns") about a restructuring or leveraged buyout of Kidde. On June 17, in a confidential report, Bear Stearns advised Sullivan that Kidde's management could acquire Kidde by paying shareholders between $43 and $47 per share. *See* Court Exhibit ("CX") 2, ¶ 8; Plaintiff's Exhibit ("PX") 2. During this period, however, the price of Kidde common stock had risen from $34 to $41 per share as a result of an increase in buying activity.

From early June through June 26, the price of Kidde common stock and warrants continued to rise, and trading volume steadily increased. PX 67. Sullivan and Bear Stearns learned that Rothschild, Inc. was acting as an agent for a secret buyer, and suspected the buyer was Hanson Trust, PLC ("Hanson"). CX 2, ¶ 14; Tr. 93. Kidde, through Bear Stearns and Lazard Freres & Co., Inc., began to contact possible suitors for a possible sale of Kidde. CX 2 ¶¶ 9–13; Tr. 92–98. During the week of June 21, press reports indicated that Kidde was "in play". Tr. 123–24, 206–08, 309–10. Kidde began negotiating with prospective buyers the following week, CX 2, ¶ 15, and Sullivan began contacting Directors for an emergency board meeting to discuss the takeover. On July 7, 1987, Kidde publicly announced that it had formally retained investment bankers, was considering restructuring or buyout options, and was negotiating with potential suitors. PX 6. On July 31, Hanson submitted an offer to purchase Kidde, PX 13, and the two companies entered into a merger agreement on August 4. PX 16. The following day, the two companies issued a joint press release announcing the merger. PX 17.

At significant junctures in this chain of events, both Downe and Warde purchased Kidde warrants—purchases that would prove very lucrative in light of the takeover developments at Kidde. At trial, Downe denied being in possession of any nonpublic information at the time he made his purchases, and denied passing any such information to Warde. Both Warde and Downe asserted at trial that they purchased Kidde warrants based on their own knowledge of the securities markets, and on the basis of information received from friends or investment advisors with no fiduciary relationship to Kidde. Relying on largely circumstantial evidence, the SEC contended that Downe, after learning nonpublic information from Sullivan directly and from attendance at Kidde board meetings, tipped Warde, who in turn tipped his brother Gregory. At the close of the evidence, Warde moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a). That motion was denied, and both claims were submitted to the jury. Defendant renews that motion now. The SEC asks for various forms of equitable relief.

## II. MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(b)

A Rule 50(b) motion should only be granted in circumstances where there is

either an utter lack of evidence supporting the verdict, so that the jury's findings could only have resulted from pure guesswork, or the evidence must be "so overwhelming that reasonable and fair-minded persons could only have reached the opposite result."

*Doctor's Assoc., Inc. v. Weible,* 92 F.3d 108 (2d Cir.1996) (quoting *Baskin v. Hawley,* 807 F.2d 1120, 1129 (2d Cir.1986)), *cert. denied,* —— U.S. ——, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997); *see also Samuels v. Air Transport Local 504,* 992 F.2d 12, 14 (2d Cir.1993). The movant cannot simply argue that the evidence "was thin," *Song v. Ives Laboratories, Inc.,* 957 F.2d 1041, 1047 (2d Cir.1992), but rather must show that " 'there can be but one conclusion as to the verdict that reasonable [persons] could have reached' " *id.* at 1046 (quoting *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970)). A court must view the evidence in the light most favorable to and draw all reasonable inferences in favor of the non-moving party, and is not permitted to weigh the evidence or assess witness credibility. *Bergstein v. Jordache Enterprises, Inc.,* No. 90 Civ. 1461, 1996 WL 271910 at *1 (S.D.N.Y. May 21, 1996); *see also United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.,* 95 F.3d 153, 164–65 (2d Cir.1996) (under Rule 50(b), both appellate court and district court must view evidence in favor of non-movant, giving non-movant benefit of all inferences, and may not weigh evidence or credibility of witnesses). For this Court to uphold the jury's verdict against Warde under § 10(b) and Rule l0b–5, there must be record evidence that: 1) Downe was in possession of material, nonpublic information regarding Kidde; 2) Warde traded in Kidde warrants while in possession of the information relayed to him by Downe; 3) Warde knew or should have known that Downe had violated a trust relationship in passing on the information, and 4) Downe personally benefitted from his disclosure to Warde. *See Dirks v. Securities and Exchange Comm.,* 463 U.S. 646, 654–64, 103 S.Ct. 3255, 3261–66, 77 L.Ed.2d 911 (1983). To uphold the jury's verdict under § 14(e) and Rule 14e–3, there must be evidence of the first three elements, but personal benefit to the tipper is not required. *United States v. Chestman,* 947 F.2d 551, 563 (2d Cir.1991).

### A. Downe's Possession of Material, Non–Public Information

◼ Drawing all inferences in the SEC's favor, there was more than ample circum-

stantial evidence from which the jury could reasonably conclude that Downe possessed material, nonpublic information. During early June 1987, when Sullivan was exploring restructuring or a leveraged buyout with Bear Stearns, Downe purchased 52,000 publicly traded warrants to purchase Kidde common stock at $40 per share, allegedly on the advice of his broker, Milton Weinger. PX 61, 62; Tr. 173. These warrants expired in November 1987, less than six months later, guaranteeing that their sale would place Downe squarely in violation of the short-swing profits rule. Downe, fully aware of this prohibition, Tr. 242–43, sought to evade the rule by purchasing warrants in securities accounts of a company owned by his son, Educated & Dedicated Service Corp., and in a Bermuda company he jointly owned, Broadsword, Ltd. Tr. 139–40, 148–49, 243. Indeed, Downe violated the short-swing profits rule when he sold the warrants during June 1987 at a profit of approximately $43,000. Tr. 169. Downe's attempts to conceal his purchases from the SEC supports an inference that Downe was in possession of inside information when he made these trades.

Downe made substantial purchases of Kidde warrants over the next month and a half, totaling over $4 million. At trial, the SEC established that the timing of Downe's purchases coincided with contact between Downe and Sullivan immediately following major developments in the takeover process. On Sunday June 28, Sullivan, in a departure from his usual business practice, met with Bear Stearns representatives at his Easthampton home to discuss the potential takeover and Sullivan's options to sell Kidde. Tr. 105–06. He visited Downe in Southampton later that day, and was visibly depressed. Tr. 176. Although Sullivan and Downe denied that any material, nonpublic information was imparted to Downe, it was Sullivan's practice to keep Directors such as Downe informed of developments at Kidde between formal board meetings, Tr. 69–70, 100–01, and in addition, the two men were close friends. Sullivan, at this point, was facing the loss of a company of which he had been President for over twenty years, and was meeting with a good friend and Kidde Di-

rector literally moments after receiving bad news about Kidde, circumstances that strongly suggest that Sullivan and Downe discussed Kidde. That evening, Downe directed his broker to purchase $750,000 in Kidde warrants for Educated and Dedicated, his friends' accounts,[1] as well as directing his partner David Salamone to buy warrants in the offshore Broadsword accounts. Tr. 178–80. Like his prior purchases of Kidde warrants, these purchases were designed to conceal his involvement, and, Downe testified, displayed a "guilty conscience," because the sale of these warrants would again place Downe in violation of the short-swing profits rule. Tr. 149, 167. This circumstantial evidence supports a reasonable inference that despite Sullivan's and Downe's denials that Sullivan gave Downe inside information, such information was indeed disclosed to Downe.[2]

Sullivan began to contact Directors during the week of June 29 when Kidde began negotiations with prospective buyers to schedule an emergency board meeting to discuss the takeover. Tr. 109–10. Sullivan testified that although it was his practice to keep Directors up to date between meetings, he did not recall speaking directly to Downe about a potential merger prior to the meeting. Tr. 101. The following weekend, Downe borrowed $1 million from Charlotte Ford on behalf of David Salamone, so that Salamone could purchase more Kidde warrants for the Broadsword offshore account. Tr. 190–91. Downe personally guaranteed the loan even though Salamone had failed to repay an earlier loan from Downe of approximately $800,-000. Tr. 192. That Monday, July 6, Downe directed Salamone to purchase $2 million of Kidde warrants for the Broadsword account, and placed an order with his broker for the purchase of Kidde warrants for his friends' accounts. Tr. 171–72, PX 63–65. Kidde's public announcement that it was considering restructuring or buyout options occurred the following day, July 7. PX 6. Significantly, by this point Downe had purchased millions of

dollars of Kidde warrants that would be worthless in a matter of months unless sold or exercised. The size of this risk strongly suggests that Downe was aware that the value of Kidde common stock would continue to rise in the near future.

Downe's final warrant purchases occurred after he attended two board meetings on July 7 and 10 where nonpublic developments at Kidde were discussed. PX 8, 10. He then purchased additional warrants for himself and others between July 21 and July 24. PX 65, 66. Kidde's merger with Hanson was announced on August 5.

Applying the standard of Rule 50(b), there is neither an "utter lack of evidence" that Downe possessed inside information, nor does the evidence compel the conclusion that he did not possess such information. Rather, the evidence showed that Downe was a close friend of Sullivan and was a Director of Kidde, had contact with Sullivan at crucial times during the takeover period, and purchased large amounts of warrants at considerable expense and risk to himself either immediately or soon after his contact with Sullivan. This evidence permitted the jury to conclude that Downe possessed inside information.

### B. Warde's Trading of Kidde Warrants

■ Circumstantial evidence also supports an entirely reasonable finding that Downe relayed the information he gained from Sullivan to Warde. Warde testified that he first became interested in Kidde in late April or early May 1987. Tr. 294–302. Despite his broker's alleged recommendations to do so, and the fact that the price and trading volume of Kidde were rising, factors which normally lead him to invest, Warde did not purchase Kidde warrants at that time. Tr. 275–85, 301. Instead, Warde made his first purchases of Kidde warrants only after speaking with Downe on the evening of June

---

1. Downe testified at trial that he voluntarily managed approximately 30 brokerage accounts on behalf of many family members and friends. Tr. 138–39.

2. Warde argues that the jury based its conclusions entirely on negative inferences drawn from its disbelief of Warde's and Downe's testimony. To the contrary, although the jury must have disbelieved the two men, there was more than enough additional circumstantial evidence from which the jury could conclude that insider trading occurred.

28, the day that Sullivan met with Bear Stearns and visited with Downe. Both Downe and Warde then purchased significant amounts of Kidde warrants on June 29. Similarly, Downe met with Warde in Sun Valley on the weekend that Sullivan was contacting Directors about recent takeover developments, immediately preceding the July 7 public announcement. Both Downe and Warde purchased significant amounts of Kidde warrants the following Monday. Tr. 188–90, 354–59, PX 59. Warde also opened an account in his wife's name to purchase $53,000 worth of warrants in her name. Tr. 368–71. On Tuesday July 7, Warde purchased additional warrants just prior to Kidde's public announcement. PX 59. This chain of events provides circumstantial evidence that information from Downe prompted Warde's trades.

Warde made a final purchase of Kidde warrants on July 20. These purchases coincided with a telephone call between Warde and Downe on that date. Tr. 365. Warde paid approximately $200,000 for an additional 9,000 warrants, taking a $197,000 "advance" from his broker to finance the transaction, although it was not his practice to borrow money to purchase securities. Tr. 365–67. Downe also purchased warrants the following day.[3] Warde also recommended that Gregory Warde purchase more Kidde warrants, which he did on July 21. Tr. 477–78. Although the evidence that Downe passed additional nonpublic information to Warde prior to the July 20 purchases is weaker than with respect to his prior warrant purchases, a pattern clearly exists. Downe receives information, Downe and Warde speak, and Warde and Downe both purchase warrants in tandem. Moreover, Warde did not purchase warrants in the interim before Downe's call.

Finally, Warde himself did not come up with a credible explanation for why he began such a significant run of purchases of Kidde warrants. At trial, Warde initially testified that Downe had told him that Martin Revson "was bullish" about Kidde. Tr. 322–23. He was impeached with his deposition, however, in which he had testified that he had not learned anything about a recommendation from Revson prior to his purchases on June 29. Tr. 323–24. He later testified at trial that he could not remember when he first learned of Revson's recommendation. Tr. 391–95, 426. Moreover, the evidence about the public information on which Warde claims to have relied was certainly in conflict. Warde claimed reliance on a particular article about "takeover artist" Asher Edelman's purchase of Kidde shares, Tr. 392–93, but could not produce it. Warde also vacillated about other sources of public information upon which he allegedly relied prior to purchasing Kidde. Tr. 322, 430. In light of these inconsistencies, the jury was entitled to discredit Warde's testimony. The remaining circumstantial evidence presented by the SEC is sufficient to support a reasonable conclusion that Warde traded in Kidde warrants while in possession of confidential information he received from Downe.

### C. Warde's Knowledge of Downe's Confidential Relationship

Although Warde denied knowing that Downe was a Director of Kidde, and Downe denied informing him of that fact, circumstantial evidence also supported this element of the SEC's case. Warde testified that his practice was to learn the names of the directors and senior management before purchasing stock in a corporation. Tr. 277–78. In fact, after evasively responding to the SEC's query as to whether knowing the identities of board members was "important" to him ("I don't know how to relate to word 'important'", Tr. at 277), Warde was confronted with his deposition, at which he testified, "I love to check and see if anybody's on the board that I might have heard of, the reputation of management and the board." *Id.* Warde also routinely reviewed a company's public filings, Tr. 278, which, in the case

---

**3.** Although Warde argues that "there is no reasonable inference that Downe tipped Warde when the alleged tippee purchased before the alleged tipper," Def's Reply Mem. at 8, such an inference is reasonable where, as here, the alleged tipper spoke with—i.e. tipped—the alleged tippee prior to the tippee's purchases. It is irrelevant that Downe purchased the following day if he tipped Warde the day before.

of Kidde, identified Downe as a director.[4] PX 55. Warde had approximately eight weeks between the time when his interest in Kidde was piqued in April or May 1987 and his initial purchases in late June 1987, which was more than enough time for him to follow his usual practice.

In addition, Warde and Downe were friends who often discussed business when they were playing cards, and admittedly discussed Kidde, at times at Warde's initiative. Tr. 135, 179, 315, 346. Warde first asked Downe in mid-May about Sullivan's health and plans for retirement. Tr. 305–07, 315–18. Although Warde argues that these inquiries were entirely innocuous because Warde knew that Downe was friendly with Sullivan, Tr. 286–87, an equally reasonable inference is that Warde inquired of Downe because he was aware that Downe was a Director of Kidde. While Warde is correct to suggest that a harmless inference could be drawn, *either* inference is permissible. The responsibility to draw the proper inference belongs to the jury at trial, and not to the Court. Moreover, the jury was permitted to discredit Warde's and Downe's testimony with respect to Warde's knowledge that Downe was a Director. In so doing, the jury could reasonably infer from the circumstantial evidence—that the two men were friends, discussed Kidde specifically and the stock market generally, that Warde's usual practice was to research companies and his deviation from this practice was unexplained—that Warde knew or should have known that Downe stood in a position of trust with respect to Kidde.

### D.  Personal Benefit to Downe

■ With respect to this element, little need be said. A benefit to the tipper can be shown, *inter alia*, by the relationship between the insider and the recipient in which the tip is part of an exchange of benefits, or can constitute the benefit enjoyed by the giver of a gift. *Dirks,* 463 U.S. at 663–64, 103 S.Ct. at 3266. Here, Downe testified that Warde had mentioned Golden Nugget and Bank of America to him. Tr. 137. While Warde argues that this comment could hardly have been a recommendation from Warde or a *quid pro quo* exchange, Downe later invested approximately $1.4 million in Golden Nugget securities. PX 29–32. Moreover, Downe testified that "it was ego" that motivated him to invest his friends' and relatives' money without financial compensation. Tr. 138–39. From this the jury could reasonably infer that Downe enjoyed the benefits of being viewed as a successful investor in the eyes of his peers—including Warde—as well as the gratification of bestowing the "gift" of his investment expertise.

### E.  Gregory Warde

■ Warde argues that insufficient evidence supported the jury's finding that he tipped his half-brother, Gregory Warde, who also invested in Kidde warrants. This contention is without merit. Gregory Warde testified that Thomas Warde recommended Kidde warrants to him. Tr. 471–78. Prior to investing in Kidde warrants, Gregory Warde had never purchased the warrants of any company, rarely traded securities, and invested primarily in mutual funds. Tr. 458, 467. He admitted in his deposition that he did not know what warrants were before he purchased Kidde warrants. Tr. 476–77. Despite making a substantial profit from this investment, at the time of his deposition eight years later, he had never invested in warrants again. Tr. 478. In addition, the timing of Gregory Warde's purchases paralleled Thomas Warde's receipt of information from Downe and his purchases of Kidde warrants in July 1987. *See* Tr. 475–78. From this evidence, the jury could reasonably conclude that Warde tipped Gregory Warde.

4.  Warde argues that the fact that Downe's name was publicly listed on public filings does not support the inference that Warde knew Downe was a Director because if it did, there would never be a need to prove the alleged tippee's knowledge of the insider's status. Def's Reply Mem. at 8. Here, however, Warde testified that it was· *his practice* to review public filings before investing. This is not necessarily the practice of all investors. Moreover, Warde had ample time to follow his usual practice between the point that he allegedly became interested in Kidde and the date that he began to purchase warrants, yet he allegedly failed to do so. Warde did not explain his deviation from the norm.

III. EQUITABLE RELIEF

A. Permanent Injunction

■ A permanent injunction against future violations of the securities laws should issue when violations of the federal securities laws have occurred and there is a reasonable likelihood of future violations. *See SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1477 (2d Cir.1996), *petition for cert. filed,* 65 U.S.L.W. 3799 (U.S. May 23, 1997) (No. 96–1862). The jury found that Warde violated the federal securities laws on multiple occasions. Warde is a professional investor who does not deny that he will continue to invest in securities in the future, thereby giving him the opportunity for future violations. Moreover, Warde, despite a contrary jury verdict, continues to assert that his conduct with respect to Kidde warrants was not improper. Such "persistent · refusals to admit any wrongdoing" strongly suggest that violators of the securities laws will not refrain from violations in the future absent an injunction. *See id.* Because Warde has been found to have violated the federal securities laws, and because there is a reasonable likelihood of future violations, a permanent injunction shall issue.

B. Disgorgement of Illicit Profits

The equitable remedy of disgorgement is designed to deprive a wrongdoer of his unjust enrichment from illicit trading in securities and to deter others from violating the securities laws. *Id.* at 1474; *SEC v. Drexel Burnham Lambert, Inc.*, 956 F.Supp. 503, 507 (S.D.N.Y.1997). To that end, the SEC requests that Warde be ordered to disgorge a total of $938,475, which includes all profits from purchases of Kidde warrants made or recommended by Warde. This latter category of purchases includes his direction of purchases on behalf of the Warde Trust, his wife Ann Brockhurst, and the purchases of his half-brother, Gregory Warde.

The Court of Appeals had held that "the proper measure of [the amount of disgorgement] is the difference between the price paid for shares at the time of purchase and the price of the shares shortly after the disclosure of the inside information." *See*

*SEC v. Patel*, 61 F.3d 137, 139–140 (2d Cir. 1995). "[D]isgorgement need only be a reasonable approximation of the profits causally connected to the violation." *See id.* at 139 (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C.Cir.1989)).

Warde disputes that he should be required to disgorge the amount requested for two reasons. First, he argues that he should not be forced to disgorge profits based on any increase in price due to public information available prior to the release of confidential information. Specifically, Warde points out that there was a significant increase in the price of Kidde warrants on July 6—prior to the July 7 announcement—from $9.88 to $14.00. *See* PX 59, 67. Warde attributes this increase to public information and rumors in the investment community which were circulated between June 29 and July 6. The SEC counters that evidence of takeover rumors prior to July 7 was sparse, that any attribution of a price increase to such rumors is pure speculation. Moreover, the SEC correctly notes that Warde and Downe's illicit purchases of Kidde warrants may have been responsible for the price increase between June 29 and July 7—for example, on July 6, the two purchased a total of 210,600 warrants, or approximately 31% of the total volume of 667,500 warrants traded that day.

■ Warde is not entitled to any reduction in the amount of disgorgement based on the possibility that takeover rumors fueled the increase in price on July 6. As the Court of Appeals has recognized, "any 'risk of uncertainty' [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created the uncertainty." *Patel*, 61 F.3d at 140 (quoting *First City*, 890 F.2d at 1232). The limited evidence of takeover rumors is insufficient to warrant a deviation from this rule, particularly when Warde's own trades may well have manipulated the price of Kidde warrants as much if not more than any rumors. In light of those trades, Warde's assertion that other investors were on an "equal informational footing" with Warde prior to July 6 is inaccurate and unsupported.

■ Warde also argues that he should not be liable for the profits directed by him for the Warde Trust and Ann Brockhurst, or for

the trades he recommended for his brother. Neither the Warde Trust nor Ann Brockhurst are truly "third parties". Warde, although not the trustee of the Trust at the time of his Kidde trades, was and remains the trust's stated beneficiary. PX 57. With respect to Brockhurst's trades, Warde himself opened the account on July 6—the day before Kidde's public announcement—directed the purchases of Kidde warrants, Tr. 368–70, and had discretionary authority over the account. PX 27. Considering the degree of control that Warde exercised over the Brockhurst account, the profits on Kidde transactions in that account should be characterized as profits that accrued to Warde, and therefore must be disgorged.

■ Gregory Warde's profits present a different issue, however. The jury found that Warde violated the securities laws when he tipped Gregory Warde on three occasions in July 1987. The SEC therefore concludes that Warde should disgorge the profits realized by his brother as profits connected to Warde's violation of the securities laws. However, the SEC has failed to show how Warde benefitted in any way from his brother's trades. As noted above, the remedy of disgorgement is designed to prevent the unjust enrichment of the *violator;* here, the SEC has failed to show how Warde was enriched by his brother's trades. Absent such evidence, and keeping in mind that the goal of disgorgement is not to punish but to return ill-gotten gains, I decline to order Warde to disgorge the profits of Gregory Warde's trades.[5]

5. Because I have concluded that Thomas Warde is not required to disgorge Gregory Warde's profits as a matter of equity, I need not consider the issue of whether, as a matter of law, Warde as a first-level tippee is liable for the trades of a second-level tippee such as Gregory Warde, *i.e.* whether a tippee who tips someone else in effect becomes a tipper who is liable, like an insider, for his or her tippee's profits. Even if Warde were liable as a matter of law, as a matter of equity, I would still conclude that he was not unjustly enriched by Gregory Warde's trades.

6. In support of this contention, Warde offers the Affirmation of Neil N. Werb ("Werb Affirmation"), former counsel to Thomas Warde, dated April 2, 1997. I decline to admit the Werb

## C. Prejudgment Interest

■ The decision of whether and at what rate to grant prejudgment interest are matters confided to the district court's broad discretion. *SEC. v. First Jersey,* 101 F.3d at 1477. Warde asserts that he should not be liable for the total amount of prejudgment interest requested by the SEC because the SEC itself was responsible for extensive delays in bringing this case to trial.[6] This assertion is inaccurate in part and irrelevant in its entirety. First, as a factual matter, Warde and Downe themselves created a substantial delay in the progress of this action, stonewalling the SEC's investigation by asserting their Fifth Amendment privilege until 1992. Second, the Court of Appeals has already rejected the argument Warde makes here. In *First Jersey,* the Court of Appeals found the award of prejudgment interest for the entire period from the illicit gains to the entry of judgment to be appropriate, "[e]ven if defendants were correct that the present litigation was protracted through some fault of the SEC." 101 F.3d 1450, 1476–77 (2d Cir.1996). The Court so concluded because "defendants plainly had the use of their unlawful profits for the entire period." *Id.* The same result obtains here. Succinctly stated, Warde is not entitled to a 10–year interest free loan in the amount of his illicit profits. Therefore, Warde must pay a total of $1,264,-501 in interest, based on the Internal Revenue Service rate used for underpayment of taxes.

## D. Civil Penalty

■ Finally, the SEC seeks a civil penalty of three times the illicit profits attribut-

Affirmation for this purpose for two reasons. First, in light of *First Jersey,* this contention, even if true, will not reduce the award of prejudgment interest. Second, the Werb Affirmation does not demonstrate that Werb is competent to testify on the issue of how the SEC operates. The competency of a witness to testify is a threshold question of law which lies exclusively in the trial court's discretion. *United States v. Gerry,* 515 F.2d 130, 137 (2d Cir.1975). Werb, an attorney who represented Warde in this action for some period of time, is not competent to testify about the appropriate length of SEC factual investigations, or about whether the SEC has "aggressively pursued" a matter.

able to Warde's trades in his brokerage accounts and the account of Ann Brockhurst pursuant to the Insider Trading Sanctions Act of 1984 ("ITSA"), codified at 15 U.S.C. § 78u(d)(2).[7] In enacting ITSA, Congress sought to remedy the "inadequate deterrent provided by present enforcement remedies for insider trading," and observed that an "injunction ... serves only a remedial function and does not penalize a defendant for the illegal conduct [and] [d]isgorgement ... merely restores a defendant to his original position without extracting a real penalty for his illegal behavior." H.R.Rep. No. 98–355, at 7–8 (1983), *reprinted in* 1984 U.S.C.C.A.N. 2274, 2280–81. The ITSA provides that "the amount of such penalty shall be determined by the court in light of the facts and circumstances, but shall not exceed three times the profit gained or loss avoided as a result of such unlawful purchase or sale." 15 U.S.C. § 78u(d)(2)(A).

■ While I find that Warde's conduct justifies the imposition of a civil penalty, I do not find that the 300 percent penalty requested by the SEC is warranted. Warde did not attempt to conceal his trades by trading under fictitious names or in offshore accounts; rather he invested in his own accounts and in the account of his wife. He has no prior history of insider trading violations, and his illicit transactions with respect to Kidde, although repeated, involved only one security.[8]

These facts notwithstanding, some penalty must be assessed to deter Warde and others like him from engaging in such conduct in the future. Based on the facts and circumstances, a 100 percent penalty is appropriate. Warde made repeated trades in Kidde warrants, delayed the SEC's investigation by asserting the Fifth Amendment, and gave conflicting testimony throughout the course of the litigation to cover up his fraud. Moreover, he was found by the jury to have tipped his half-brother Gregory Warde. Therefore, while I decline to impose a 300 percent penalty, I impose a civil penalty of 100 percent of Warde's illicit profits.

7. In 1988, this penalty provision was amended by the Insider Trading and Securities Fraud Enforcement Act of 1988, and is now codified at 15 U.S.C. § 78u–1. The events at issue in this action predate the 1988 amendment, and thus the 1984 provision applies here.

8. In so finding, I decline to accept Warde's proffer of the Werb Affirmation. Werb, as Warde's former attorney, testifies to facts concerning the unsuccessful settlement negotiations between Warde and the SEC. This proffer violates Fed. R.Evid. 408, which requires the exclusion of such evidence unless offered to show the bias or prejudice of a witness. Warde argues that the Affirmation serves (1) to "impeach" the SEC's "testimony" that Warde's behavior is so egregious that it merits a 300 percent penalty; and (2) to rehabilitate Warde's credibility, by showing that the/ SEC's evaluation of Warde's culpability during the settlement negotiations differed dramatically from their evaluation in this penalty phase of the proceedings. Warde asserts that this de facto "reevaluation" of Warde's culpability also shows the SEC's bad faith in seeking a civil penalty.

As an initial matter, the SEC was entitled to reassert its demand for a civil penalty—a demand it made in the Complaint—after settlement negotiations concluded unsuccessfully. That final approval for the settlement was not obtained from the ultimate SEC decisionmakers suggests that those decisionmakers did not feel that a cash settlement alone would sufficiently compensate for Warde's past actions or deter similar actions in the future. Even were the Werb Affirmation admissible, I would find no bad faith on the SEC's part under the circumstances.

Warde also argues that the Werb Affirmation does not violate Rule 408 because it is not offered "to prove the liability for or invalidity of the claim or its amount." *See* Fed.R.Evid. 408. Warde attempts to distinguish between the amount of disgorgement, which he argues is covered by Rule 408 as the "amount" of the claim, and the amount of the civil penalty, which in Warde's view is not part of the claim. Although this argument is creative, in the context of SEC negotiations about insider trading, where a panoply of remedies are available to the SEC, such a distinction would seriously undercut the SEC's ability or willingness to discuss waiver of civil penalties as part of a settlement effort. In this context, admitting the Werb Affirmation would undermine the fundamental principles of Rule 408.

Finally, I reject Warde's contention that the Werb Affirmation serves to "impeach" the SEC's "testimony." There is no *witness* to impeach with this Affirmation; rather, Warde seeks to contradict the SEC's position on the egregiousness of Warde's conduct. However, in the final analysis, it is the Court's task to evaluate the evidence and assess any necessary civil penalty, and not the SEC's. Even were I to admit the Werb Affirmation on this point, I do not find Werb's testimony any more relevant to the issue of egregiousness than the evidence presented at trial. I therefore decline to admit the Werb Affirmation on this issue.

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for judgment as a matter of law is denied. A permanent injunction will issue against Warde. Warde must also disgorge $871,725, on which Warde will pay prejudgment interest of $1,264,501, based on the Internal Revenue Service rate used for underpayment of taxes. Finally, Warde must pay a civil penalty of $871,725.

SO ORDERED.