**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Donna YUN, et al., Defendants.**

**No. 99–117–CIV–ORL–22A.**

United States District Court,
M.D. Florida,
Tampa Division.

May 23, 2001.

Mark Kreitman, Christina K. McGlosson, Larry P. Ellsworth, SEC, Washington, DC, J. Kevin Edmundson, SEC, Fort Worth, TX, for Plaintiff.

Morris Weinberg, Jr., Laura L. Vaughan, Zuckerman, Spaeder, Taylor & Evans, Tampa, FL, Michael J. Barta, J. Bradley Bennett, Baker & Botts, LLP, Washington, DC, Carl Francis Schoeppl, Schoeppl, Burke & Kayton, P.A., Boca Raton, FL, Norma Shepard Lindsey, Law Offices of Norma Shepard Lindsey, Miami, FL, for Defendants.

### *MEMORANDUM & ORDER*

ALDRICH, District Judge.

The Securities and Exchange Commission ("SEC"), the plaintiff, brought this misappropriation theory insider trading case against the defendants, Donna Yun and Jerry Burch, for violations of Section 10(b) of the Securities Exchange Act of 1934. On December 14, 2000, the jury entered a verdict in favor of the SEC. On January 12, 2001, this Court, per Judge Ann Aldrich (N.D.Ohio) sitting by designation, upheld the jury's verdict on the defendants' numerous post-trial motions. *See SEC v. Yun,* 130 F.Supp.2d 1348 (M.D.Fla.2001). The SEC now moves for civil remedies (doc. #204). Yun and Burch oppose. For the following reasons, this Court imposes the following remedies in this case:

1) disgorgement in the amount of $269,000 jointly liable against Burch and Yun;

2) pre-judgment interest to be calculated pursuant to the 52–Week Treasury Bill jointly liable against Burch and Yun;

3) civil penalty in the amount of $100,000 against Yun; and

4) civil penalty in the amount of $100,000 against Burch.

### I. Background

The facts of this case have been commented on by this Court in its previous order denying Yun's and Burch's various post-trial motions. *See Yun,* 130 F.Supp.2d 1348. In short, this case involves an insider trading scheme in which

Donna Yun ("Yun"), the wife of David Yun, president of the Book Fairs Division of Scholastic Corp. ("Scholastic"), tipped a friend and co-worker, Jerry Burch, to an impending drop in the price of Scholastic stock. In reliance on this tip, Burch purchased a series of put options and sold them for a profit of $269,000. Soon after the realization of these profits, the SEC began investigating Burch and Yun, and elicited conflicting and inconsistent stories as to the nature and extent of the alleged tip. The SEC, through its investigation, concluded that the alleged tip occurred at a real estate broker party at the Isleworth Country Club ("the Isleworth Party"). Although Burch initially endorsed this conclusion, Burch and Yun eventually asserted that the tip occurred when Burch eavesdropped on a telephone conversation between Yun and her lawyer in an office shared by the two defendants.

In the pre-trial stage of this case, the pleadings were ruled upon by the Honorable Ann Conway (M.D.Fla.). Finding no changes in the law or the facts, and that the prior rulings were not clearly erroneous, *see Oladeinde v. City of Birmingham,* 230 F.3d 1275, 1288 (11th Cir.2000), this Court, sitting by designation, tried the case, substantially relying on Judge Conway's prior rulings of law under the law of the case doctrine. *See Yun,* 130 F.Supp.2d at 1352 (citing *Williams v. Commissioner of the Internal Revenue,* 1 F.3d 502, 503 (7th Cir.1993)). The jury returned a verdict for the government. This Court then ruled on Burch and Yun's post-trial motions, denying numerous motions for judgment as a matter of law or in the alternative, a new trial. *See id.* This Court then set a briefing schedule for arguments as to remedies. The parties have submitted their briefs, and this Court will now address their claims.

## II. Analysis

The government proposes the following remedies for the defendants:

1) disgorgement jointly liable against Burch and Yun;

2) prejudgment interest jointly liable against Burch and Yun to be determined by 28 U.S.C. § 6621(a)(2);

3) permanent Injunctions issued against Burch and Yun;

4) civil penalty in the amount of $807,000 against Yun;

5) civil penalty in the amount of $807,000 against Burch.

By contrast, Burch and Yun propose the following remedies:

1) disgorgement issued only against Burch;

2) prejudgment interest to be determined by the Court, liable only against Burch;

3) no injunctions;

4) civil penalty in the amount $5,000 against Yun;

5) civil penalty in the amount of less than $100,000 against Burch.

This section will address the arguments for each remedy in turn, identifying the applicable law, and applying the law to the facts of the case.

## A. Disgorgement

█ Disgorgement of the ill-gotten profits from an insider trading scheme is a remedy often granted against those who violate the securities laws. No statute governs the disgorgement of ill-gotten profits—rather, principles of equity provide the foundation for this penalty. *See Janigan v. Taylor,* 344 F.2d 781, 786 (1st Cir.1965) ("It is simple equity that a wrongdoer should disgorge his fraudulent enrichment."); *see also SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1307 (2d Cir.

1971) (noting that disgorgement of profits arises from the inherent equity power of the district courts). Courts often note that the primary purpose of disgorgement is the prevention of unjust enrichment— that is, that those who have violated the securities laws are not allowed to gain by their illegal conduct. *See Hateley v. SEC,* 8 F.3d 653 (9th Cir.1993); *SEC v. Tome,* 833 F.2d 1086, 1090 (2d Cir.1987). Accordingly, disgorgement is a powerful deterrent against misuse of material, nonpublic information. *See SEC v. Texas Gulf Sulphur,* 312 F.Supp. 77, 91–92 (S.D.N.Y.1970). Moreover, because disgorgement is an equitable remedy, it does not serve to punish or fine the wrongdoer, but simply serves to prevent the unjust enrichment. *See Hateley,* 8 F.3d at 656. Interestingly, although equity supports the use of disgorgement in simple fraud actions for the restitution of those harmed, such justification has generally not been endorsed by the courts in the securities law sphere. *Compare SEC v. Tome,* 833 F.2d 1086, 1090 (2d Cir.1987) ("[T]he primary purpose of disgorgement is not to compensate investors.") *and SEC v. Blatt,* 583 F.2d 1325, 1335 (5th Cir.1978) ("The purpose of disgorgement is not to compensate the victims of fraud, but to deprive the wrongdoer of his ill-gotten gain.") *with* RESTATEMENT OF RESTITUTION § 150 (1937) ("Ordinarily, the measure of restitution is the amount of benefit received ..., but ..., if the loss suffered differs from the amount of benefit received the measure of restitution may be more or less than the loss suffered or more or less than the enrichment.").

As the SEC notes, disgorgement is usually considered rather routine; if a person is found to have violated the securities laws, and profited from the ensuing transaction, courts simply order the disgorgement of those profits. However, this analysis becomes complicated in tipper-tippee insider trading cases, especially when the

tipper does not realize the profits the tippee makes due to the insider trading scheme. In such instances, the most difficult issue concerning disgorgement arises—joint liability between the tipper and tippee.

██ The earliest case to administer disgorgement in a joint liability form was *Texas Gulf Sulphur,* 446 F.2d 1301. In that case, a corporate insider, Kenneth Darke, a geologist working for a mining company, had inside information that an important mineral resource had recently been found. He then tipped several acquaintances and workers to the find. The SEC subsequently brought a civil action against Darke, but not against the acquaintances he had tipped. The district court held Darke liable for disgorgement of all the profits realized as a result of his tips, even though it was undisputed that Darke did not enjoy the entire profits of the tippees. In upholding this judgment, the Second Circuit noted that requiring Darke to disgorge the profits of the tippees imposed a "hardship." *Id.* at 1308. However, that court explained:

> [W]ithout such a remedy, insiders could easily evade their duty to refrain from trading on the basis of inside information. Either the transactions so traded could be concluded by a relative or an acquaintance of the insider, or implied understandings could arise under which reciprocal tips between insiders in different corporations could be given.

*Id.* Congress explicitly endorsed such reasoning in subsequent legislation which authorized civil penalties in insider trading cases:

> [I]f a tipper's communication resulted in profits to his direct tippee and to remote tippees as well, the Commission could obtain disgorgement from the tipper of the profits of both the direct and remote tippees.

H.R. Report 910, 100th Congress, 2d Session, 1988, 1988 U.S.Code Cong. and Admin. News 6043, 1988 WL 169923 n. 16 ("H.R. Report 910"). Under this precedent and congressional authority, it has become well-established that joint liability between a tipper and tippee is appropriate, even if the tipper received few or none of the profits realized by the tippee. *See SEC v. Warde,* 151 F.3d 42, 49 (2d Cir. 1998); *SEC v. Clark,* 915 F.2d 439, 454 (9th Cir.1990).

Such authority, however, does not establish an ironclad rule. Courts also frequently note that disgorgement, as an equitable remedy, should not operate as a fine. *See Hateley,* 8 F.3d at 656; *SEC v. World Gambling Corp.* 555 F.Supp. 930 (S.D.N.Y.1983) ("To the extent that joint liability requires payment of a sum greater than the profits unlawfully gained by the fraudulent transactions, it is a penalty and therefore improper."). Applying the maxim that disgorgement seeks only to prevent unjust enrichment, courts have ordered defendants to disgorge only the profits they received in the insider trading scheme. *See SEC v. Falbo,* 14 F.Supp.2d 508, 527–29 (S.D.N.Y.1998) (particularizing the amount of disgorgement to the profits realized by each defendant); *SEC v. Downe,* 969 F.Supp. 149, 158 (S.D.N.Y. 1997) ("the remedy of disgorgement is designed to prevent the unjust enrichment of the *violator;* here, the SEC has failed to show how [the tipper-defendant] was enriched by his brother's trades"); *SEC v. Ingram,* 694 F.Supp. 1437, 1442 (C.D.Cal. 1988) ("With reference to an order to disgorge illegally gained profits, the court will be limited to the amount by which the defendant profited from his wrong plus interest."); *World Gambling Corp.,* 555 F.Supp. at 934. At least one court has reduced the disgorgement remedy by the amount a defendant paid to his broker, in recognition of the fact that money paid for broker fees cannot be unjust enrichment

or an ill-gotten gain. *See SEC v. Shah,* No. 92–Civ.–1952, 1993 WL 288285, at *5 (S.D.N.Y. July 28, 1993). Indeed, one scholar aptly notes the inconsistencies in imposing joint liability for disgorgement on a tipper who received no benefit from a tippee.

> The SEC ... has demanded that a person who feeds material nonpublic information (the tipper) *gratis* to another person who trades on that information and profits thereby (the tippee) must give up the profits, relying on the theory that a wrongdoer should not be allowed to profit from her wrongful acts. This does not make sense because (1) it takes money from the tipper, who did not profit from the trading, and (2) it leaves the tippee with the profits stemming from the violation.

John K. Robinson, *A Reconsideration of the Disgorgement Remedy in Tipper–Tippee Insider Trading Cases,* 62 Geo. Wash. L. Rev. 432, 433 (1994) ("Robinson, *Reconsideration of Disgorgement* ").

■ In this case, the SEC seeks to hold Burch and Yun jointly liable for the profits of the insider trading scheme, $269,000, noting the long line of cases establishing that joint liability is routinely imposed against non-profiting tippers. By contrast, Burch and Yun seek disgorgement only against Burch, noting the long line of cases applying disgorgement liability only against those defendants who actually realize the profits of the insider trading scheme. While this Court finds that Burch and Yun's arguments have some persuasive force, this Court concludes that principles of equity, in this case, favor an imposition of joint liability for disgorgement.

As an initial matter, this Court recognizes that Donna Yun received no tangible, monetary benefit from the insider trading scheme. However, in a previous order,

this Court also recognized that there is some evidence of an intangible benefit for Yun's tip to Burch, in the form of a gift, or improved networking contacts. *See Yun*, 130 F.Supp.2d at 1354. This Court has also previously noted that given the speed with which the SEC began investigating the instant insider trading scheme, less than twelve hours after Burch realized the profits, any evidence of proposed profit-sharing will likely be circumstantial. *See id.* at 1354. Accordingly, this Court concludes that Yun received some intangible unjust enrichment from the insider trading scheme; moreover, this Court cannot categorically conclude that Yun and Burch did not plan that Yun might receive some other, tangible benefit.

More importantly, the justification for the imposition of joint liability for non-profiting tippers neatly fit the facts of this case. As the Second Circuit notes:

> A tippee's gains are attributable to the tipper, regardless whether benefit accrues to the tipper. The value of the rule in preventing misuse of insider information would be virtually nullified if those in possession of such information, although prohibited from trading in their own accounts, were free to use the inside information on trades to benefit their families, friends, and business associates.

*Warde*, 151 F.3d at 49. In this case, it is undisputed that Burch and Yun were co-workers who had worked closely together, sharing commissions on numerous real-estate deals. *See Yun*, 130 F.Supp.2d at 1354. Given this relatively close business relationship, then, Burch and Yun could have entered into agreement where a tip in Scholastic was repaid with future consideration in real-estate deals, or other, less direct forms of compensation. While no evidence presented at trial establishes such an agreement, this Court concludes that the deterrent effect of disgorgement,

*see Texas Gulf Sulphur*, 312 F.Supp. at 91–92, would be compromised in this case, given the highly facile, and easily concealable manner in which Burch and Yun could have exchanged compensation. *See also Texas Gulf Sulphur*, 446 F.2d at 1308 (noting that disgorgement of a non-profiting tipper was appropriate since "implied understandings could arise under which reciprocal tips between insiders in different corporations could be given").

Finally, this Court notes that criticism of joint liability for disgorgement, while appealing, is ultimately unpersuasive in this case. In *Reconsideration of Disgorgement*, Robinson argues that the need for a deterrent effect on a non-profiting tipper through the joint liability of disgorgement dissolved with the passage of legislation authorizing civil penalties. *See* Robinson, *Reconsideration of Disgorgement*, 62 GEO. WASH. L. REV. at 443–44. While analytically appealing, such an argument ignores the clear congressional intent that joint liability for a non-profiting tipper was specifically endorsed by the House of Representative in the passage of the bill establishing civil penalties for insider trading. *See* H.R. Report 910, U.S.Code Cong. and Admin. News 6043 at n. 16. Such a congressional endorsement is understandable given the long-held view in Anglo–American jurisprudence that members of a conspiracy are held criminally liable for the reasonably foreseeable actions of their co-conspirators. *See e.g.* U.S.S.G. § 1B1.3 cmt. n. 2; *United States v. Diaz*, 248 F.3d 1065, 1098–1101 (11th Cir.2001). Consequently, in this civil conspiracy, attributing the ill-gotten gain to Yun presents a symmetrical analogy; Burch's realization of profits from this insider trading scheme was unquestionably a reasonably foreseeable consequence of Yun's actions.

Accordingly, this Court orders Burch and Yun to disgorge the profits of the

insider trading scheme, to wit, $269,000. Pursuant to the preceding discussion, this Court further orders that Burch and Yun be held jointly liable for this amount.

## B. Interest

■ Prejudgment interest is imposed, in the discretion of the trial court, to divest those found liable under the securities laws of any benefit accrued from the use of the ill-gotten gain. *See Warde,* 151 F.3d at 50. Courts have varied widely in determining the amount of prejudgment interest. When the SEC itself orders disgorgement, either through an administrative proceeding, or through settlement of a possible enforcement action, the interest rate imposed is generally the IRS underpayment rate. *See SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1476 (2d Cir.1996); *see also,* 26 U.S.C. § 6621(a)(2) (defining the IRS underpayment rate as the Federal Reserve short term interest rate plus three percentage points). Courts have adopted the IRS underpayment rate without controversy. *See First Jersey Sec., Inc.,* 101 F.3d at 1476; *SEC v. Farrell,* No. 95–CV–6133T, 1996 WL 788367, at *1 (W.D.N.Y. Nov.6, 1996). However, cases can be found imposing interest rates determined by the court. *See e.g. SEC v. Ferrero,* No. IP 91–271–C, 1993 WL 625964, at * 18 (S.D.Ind. Nov.15, 1993) (fixing prejudgment interest rate at 8%). The time frame for the imposition of prejudgment interest usually begins with the date of the unlawful gain and ends at the entry of judgment. *See First Jersey Sec., Inc.,* 101 F.3d at 1477.

Accordingly, this Court imposes prejudgment interest, to run from February 17, 1997—the date of Burch's realization of the profits of the insider trading scheme— to the entry of this judgment. As per this Court's standard practice, this Court elects to impose the interest rate of the 52–Week United States Treasury Bill during the applicable time frame. Consistent with the preceding discussion concerning disgorgement, this Court further notes that prejudgment interest is jointly liable against Burch and Yun.

## C. Injunction

■ · The SEC also seeks a permanent injunction enjoining Yun and Burch from violating securities laws in the future. Courts have previously noted that "an injunction is a drastic remedy and not a mild prophylactic." *See SEC v. Ingoldsby,* No. 88–1001–MA, 1990 WL 120731, at *2 (D.Mass. May 15, 1990) *citing Aaron v. SEC,* 446 U.S. 680, 703, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). Consequently, courts have required 'the SEC to furnish proof that a recurrent violation is reasonably likely to occur. *See id.; SEC v. Youmans,* 729 F.2d 413, 415 (6th Cir.1984) (holding "the test for an injunction is whether the SEC had shown that there is a reasonable and substantial likelihood that [the defendant], if not enjoined, would violate the securities laws in the future") (internal quotes and citations omitted). In the Eleventh Circuit, the "mere fact of past violations" is insufficient to establish the propriety of an injunction. *SEC v. Blatt,* 583 F.2d 1325, 1334 (5th Cir.1978); *see also Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981). District courts should also consider other factors in determining whether an injunction is properly issued:

> [T]he egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

*SEC v. Carriba Air, Inc.,* 681 F.2d 1318, 1322 (11th Cir.1982).

Under the facts of this case, an injunction is not appropriate against either Yun or Burch. Yun and Burch's actions were isolated; the SEC and the defendants agree that Yun has never before revealed insider information, and Burch's numerous trades on that information all occurred within a three-day time period. Moreover, the insider trading scheme in this case was not egregious. *Cf. SEC v. Chapnick,* No. 90–6793–CIV–PAINE, 1994 WL 113040, at *1 (S.D.Fla. Feb.11, 1994) (three-times penalty appropriate where corporate vice president "caused [the company] to disseminate false and misleading financial statements, engaged in unauthorized securities transactions, altered bank's books to hide losses, appropriated $3.5 million from [the company] and sold stock at an inflated price before the fraudulent scheme became public"); *SEC v. Rubin,* No. 91–CIV–6531(MBM), 1993 WL 405428, at *5 (S.D.N.Y. Oct.8, 1993) (where defendants' hid profits in dummy accounts, and conspired to continue trading other inside information, conduct merited injunction). Though the SEC notes that neither Yun nor Burch have acknowledged wrong-doing on their part, Yun and Burch have both expressed their regret at involvement in the insider trading scheme. *See e.g.* Yun Dec. at ¶3 attached to Yun's Resp. Pl.'s Request for Entry of J. Exh. A. ("Yun Dec.") ("While I disagree with the jury's verdict in this case, I fully appreciate the importance of the securities laws that were involved in my case, and I will never again put myself in a position where the SEC or anyone else can question my actions."). In any event, where litigants do not publicly acknowledge the wrongfulness of their conduct due to a decision to contest SEC enforcement, such actions should not prejudice those litigants since a full and vigorous defense is a "right under our system of justice." *SEC v. Brethen,* No. C–3–90–

071, 1992 WL 420867, at * 24 (S.D.Ohio Oct.15, 1992); *see also Ingoldsby,* 1990 WL 120731, at *3 ("Absent a showing of bad faith, the defendant should not be prejudiced for presenting a vigorous defense and requiring the SEC to meet the proper evidentiary burden both at trial and at the injunctive relief stage of judicial proceedings."). Finally, neither Yun nor Burch have ready access to material, nonpublic information. Yun's source for insider information was David Yun, who will retire from his position at Scholastic in July 2001. *See* Yun Dec. at ¶2. Moreover, Burch's occupation as a realtor gives him little access to material, nonpublic information that could be used to violate the securities laws.

Under facts similar to this case, other courts have refused to issue injunctive relief. *See Brethen,* 1992 WL 420867, at *24 (noting that injunction was inappropriate where corporate manager traded on inside information on only two separate days, violation was isolated, not particularly egregious, and likelihood of future access to inside information unlikely given his age and instant enforcement action); *Ingoldsby,* 1990 WL 120731, at *3 (where insider trading was an isolated violation, and there was no evidence of future violations, court refused to issue injunction even though defendant's employment continued to offer access to material non-public information); *SEC v. Ingram,* 694 F.Supp. 1437, 1442 (C.D.Cal.1988) (injunction inappropriate where broker traded as insider only once in nineteen year career). Indeed, injunctions appear to be appropriate in insider trading cases where the conduct of the defendants was much more egregious, and the opportunity for future violations much more likely, than in the instant case. *See e.g. Farrell,* 1996 WL 788367, at *3–*4, *7–*8 (injunction appropriate where defendant was a corporate insider who had tipped at least three friends to impending merger, had himself traded on inside infor-

mation, and violations occurred repeatedly over the course of two months); *Ferrero*, 1993 WL 625964, at *16–17 (noting that since the defendants had engaged in a series of insider trades over a period of several months, attempted to hide the violations with fabrications, and had business contacts and relations that gave them access to material, nonpublic information, injunction appropriate); *Rubin*, 1993 WL 405428, at *5–*6 (injunction appropriate where violations occurred more than once, defendants attempted to hide the violations through dummy accounts, and both defendants had opportunity for future violations given their employment as a broker and a company president).

Accordingly, this Court denies the SEC's request to impose an injunction against either Burch or Yun.

## D. Civil Penalty

■ Under the Insider Trading and Securities Fraud Enforcement Act ("ITSFEA"), 15 U.S.C. § 78u–1(a)(2), courts may, in light of the facts of circumstances of the case, impose a penalty up to "three times the profit gained or loss avoided as a result of such unlawful purchase, sale or communication" arising from insider trading. The ITSFEA civil penalties were a congressional response to the insider trading scandals of the 1980s, and were enacted to "enhance deterrence against insider trading, and where deterrence fails, to augment the current detection and punishment of this behavior." H.R. Report 910, 1988 U.S.Code Cong. and Admin. News at 6044. Judicial consensus has yet to develop as to which particular "facts and circumstances" courts should focus on in order to promote the twin aims of deterrence and punishment. *See SEC v. Chapnick*, No. 90–6793–CIV–PAINE, 1994 WL

113040, at * 4 (S.D.Fla. Feb.11, 1994); *Brethen*, 1992 WL 420867, at *25. However, courts have previously focused on the egregiousness of the violations, the isolated or repeated nature of the violations, the degree of scienter involved, the deterrent effect given the defendant's financial worth, and other penalties arising from the conduct. *See e.g. Rubin*, 1993 WL 405428, at *7 (noting that since the defendant was impecunious, $1000 fine sufficient for deterrent effect); *Shah*, 1993 WL 288285, at *6 (noting that the numerous criminal and administrative penalties sufficiently deterred the defendant such that no civil penalties were warranted); *Brethen*, 1992 WL 420867, at *25 (setting up three-factor test of egregiousness, frequency of violations, and scienter).

In this case, the SEC moves this Court to impose a penalty of $807,000 against Yun and $807,000 against Burch. These penalties are the maximum allowed under ITSFEA, and are not warranted in this case. Indeed, the cases cited by the SEC in support of a three-times penalty involve misdeeds radically more egregious than the conduct in this case. *See Chapnick*, 1994 WL 113040, at *1 (three-times penalty appropriate where corporate vice president "caused [the company] to disseminate false and misleading financial statements, engaged in unauthorized securities transactions, altered bank's books to hide losses, appropriated $3.5 million from [the company] and sold stock at an inflated price before the fraudulent scheme became public"); *See Ferrero*, 1993 WL 625964, at *4–*8, *19 (three-times penalty appropriate where defendant engaged in insider trading scheme over the course of two months, engaging in numerous trades, with two different corporations, covered up his deeds, and tipped others).[1]

---

1. The SEC also notes that it settles dozens of insider trading cases every year, with a standard offer "generally on the basis of an injunction, full disgorgement with interest, and a one-time penalty equal to the disgorgement." SEC's Mot. Entry of J. at 17, n. 5.

Where the SEC appears to be over-reaching, the defendants similarly down-play the importance of penalties. Yun argues that the degree of scienter in this case is "minuscule." *See* Yun's Resp. Pl.'s Request Entry of J. at 13. As evidence of this, Yun states that the "severe reckless-ness" instruction was vigorously opposed by the defendants at trial, *see Yun*, 130 F.Supp.2d at 1351, and has been adopted in no other tipping case. *See* Yun's Resp. Pl.'s Request Entry of J. at 13. Yun further argues that no evidence establishes intentional conduct; therefore the jury must have found liability on the basis of recklessness. *See id.* at 2. Given such a low level of scienter, Yun argues the egre-giousness of the violations is similarly low. *See id.* at 4. Moreover, as this Court noted earlier, the likelihood of repetition in this case is small, given Yun's declaration that her husband will retire as a corporate ex-ecutive in July 2001. *See* Yun Dec. at ¶ 2. Accordingly, Yun asks for nominal sanc-tions in the amount of $5,000.

Burch, making similar arguments to those of Yun, also notes that he is finan-cially unable to pay the proposed disgorge-ment. Consequently, the SEC's proposed $807,000 civil penalty is far beyond his ability to pay. Accordingly, Burch asks for no civil penalty, or in the alternative, a penalty less than $100,000.

While this Court recognizes that Yun's involvement in this insider trading scheme merits penalties near the low end of the scale, other factors militate in favor of imposing something more than the nomi-nal amount proposed. As an initial mat-ter, despite Yun's protestations that the

"severe recklessness" instruction in insider trading cases is a radical departure from established law, other courts have applied recklessness instructions in insider trading cases, and imposed remedies under similar scienter findings. *See Ingram*, 694 F.Supp. at 1440–41 (noting that reckless-ness is sufficient to find liability for insider trading, and imposing disgorgement, but declining to impose an injunction or civil penalties). Moreover, as this Court has noted in a previous order, this case rested largely on credibility determinations be-tween the competing stories of the defen-dants and the SEC investigators. *See Yun*, 130 F.Supp.2d at 1357. Assuming the jury disbelieved most, if not all of the testimony of the defense witnesses, and given the significant circumstantial evi-dence of an insider trading scheme, the jury could just as well have made an inten-tional scienter finding, and totally ignored the "recklessness" charges. *See e.g. id.* (noting such circumstantial evidence as "the suspicious timing of the alleged tip and Burch's purchase of the Scholastic op-tions, Burch's prior history establishing no experience with put options, the inherent riskiness of buying those put options with a 48 hour expiration, the amount of money relative to Burch's yearly income spent on these options, the long-term business and social relationship between Burch and Yun, the telephone calls made by Yun to Burch after the beginning of the SEC investigation, and the testimony of wit-nesses establishing that Burch received the tip from Yun at the Isleworth party" are adequate foundation for a jury deter-mination of liability without reliance on

The SEC further argues that in order for the "normal settlement package [ ] to continue to work as an incentive," it is important that the "the courts impose more substantial penal-ties." *Id.* Other courts have explicitly refused to accept such reasoning. *Brethen*, 1992 WL 420867, at * 24 (noting that defendants should not be prejudiced from seeking a trial

on the merits, since that is a defendant's "right under our system of justice"); *see also Ingoldsby*, 1990 WL 120731, at *3. Accord-ingly, this Court will give no weight to the in-ternal settlement policies of the SEC in for-mulating the appropriate civil penalty under ITSFEA.

"recklessness"). In short, this Court pays no heed to the defendants' repeated insistence that the level of scienter in this case *must* have amounted to a finding of severe recklessness. It is not the province of this Court to divine the jury's interpretation of the evidence, especially where there is no legal nor logical bar to a fact-finder's possible conclusion that Yun acted intentionally. For the purposes of the penalty phase then, this Court simply concludes that Yun's level of scienter and misconduct, while far lower than that of the egregious and repeated violations noted in *Rubin* and *Chapnick*, is also clearly more than the nominal level proposed.

Two other related factors also militate in favor of a significant penalty for Yun. The first is Congress' express provision that ITSFEA civil penalties should be imposed to deter and punish those found to have violated the federal securities laws. *See* H.R. Report 910, 1988 U.S.Code Cong. and Admin. News 6043, 6044. The second is this Court's recognition of Yun's significant wealth. Though the exact amount is unclear, Yun herself estimates her net worth as $767,000, *see* Yun Dec. at ¶ 5, whereas the SEC notes that the evidence adduced at trial, in addition to documentation of David Yun's recent exercise of Scholastic options, places the Yun family net worth in excess of $7.1 million. *See* SEC's Reply Supp. Mot. Entry of J. at 5. Under either quantum, Yun's proposed $5,000 fine is insufficient to significantly deter or punish misconduct in this case. Indeed, other courts have noted the interplay between a defendant's net worth, and giving adequate effect to congressional intentions to deter and punish insider trading. *See Ferrero,* 1993 WL 625964, at * 19 (imposing $838,875 fine given the defendant's statement that $500,000 is "a very small part of his total net worth"); *Rubin,* 1993 WL 405428, at *7.

Under these circumstances, given substantial evidence of Yun's involvement in this insider trading scheme, her significant wealth, and the clear congressional intent to deter and punish those who have violated federal security laws, this Court elects to impose a $100,000 civil penalty against Yun.

■ Burch's conduct also necessitates a significant penalty. Whereas Yun disclosed, either intentionally or recklessly, the inside information, Burch himself traded and profited on the information. Burch also readily admitted at trial that he engaged in misstatements to SEC investigators in order to obfuscate any misconduct. Indeed, Yun herself acknowledges that Burch is "morally" culpable for the securities violation in this case. *See* Yun's Resp. Pl.'s Request for Entry of J. at 4. Moreover, considering the relatively large amount of unjust enrichment in this case, $269,000, a penalty proportional to the amount of harm is appropriate.

This Court is persuaded, however, by Burch's statement that he is impecunious. According to his declaration submitted with the current round of motions, Burch's net worth is $264,282. *See* Burch Dec. at ¶ 4 attached to Burch's Mem. Opp'n Pl.s Mot Entry of J. Exh. A. Given that this Court has already ordered that Burch be jointly liable for the disgorgement of the $269,000 in ill-gotten gains, plus prejudgment interest, any civil penalty imposed will have a significant impact on Burch's resources. Though this Court notes that, even assuming the most favorable interpretation of the facts elicited at trial, Burch's actions establish significant levels of misconduct, this Court will leaven the civil penalty in recognition of Burch's financial condition. *See e.g. SEC v. Soroosh,* No. 98–35006, 166 F.3d 343, 1998 WL 904696, at *2 (9th Cir. Dec.24, 1998) (imposing a $160,000 fine, far below the $1.5

million statutory maximum, despite high level of misconduct, given the defendant's lack of resources); *Rubin,* 1993 WL 405428, at *7 (imposing $1,000 given small amount of unjust enrichment, and the defendant's poor financial condition).

Under these circumstances, given evidence of significant wrongdoing by Burch, his currently dire financial condition, and the congressional intent to deter and punish those found to have violated federal securities laws, this Court elects to impose a $100,000 penalty against Burch.

### III.  Conclusion

For these reasons, this Court orders the following remedies in this case:

1) disgorgement in the amount of $269,000 jointly liable against Burch and Yun;

2) pre-judgment interest to be calculated pursuant to the 52–Week Treasury Bill from February 17, 1997 to the entry of this judgment jointly liable against Burch and Yun;

3) civil penalty in the amount of $100,000 against Yun;  and

4) civil penalty in the amount of $100,000 against Burch.

Final judgment in this case is amended to reflect the imposition of these remedies.

This order is final and appealable.

IT IS SO ORDERED.